[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-16723

_____

D. C. Docket No. 99-10058-CV-JLK

STEVEN LOFTON,
DOUGLAS HOUGHTON,
TIMOTHY ACARO,
next friend of John Doe and John Roe,
WAYNE SMITH,
DANIEL SKAHEN,
JOHN DOE,
JOHN ROE,
minor children,

Plaintiffs-Appellants,

ANGELA GILMORE, et al.,

Plaintiffs,

versus

SECRETARY OF THE DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, (formerly H.R.S.),
DISTRICT ADMINISTRATOR, District XI of Florida
Department of Children and Family Services,

Defendants-Appellees,

CHARLIE CRIST,
Attorney General of the State of Florida,

Defendant,

ROBERT PAPPAS, District Administrator, District X
of Florida Department of Children and Family
Services,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 28, 2004)**

Before BIRCH, CARNES and HUG[*], Circuit Judges.

BIRCH, Circuit Judge:

In this appeal, we decide the states' rights issue of whether Florida Statute § 63.042(3), which prevents adoption by practicing homosexuals, is constitutional as enacted by the Florida legislature and as subsequently enforced. The district court granted summary judgment to Florida over an equal protection and due process challenge by homosexual persons desiring to adopt. We AFFIRM.

---

[*] Honorable Procter Hug, Jr., United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

# I. BACKGROUND

## A. The Challenged Florida Statute

Since 1977, Florida's adoption law has contained a codified prohibition on adoption by any "homosexual" person. 1977 Fla. Laws, ch. 77-140, § 1, Fla. Stat. § 63.042(3) (2002).[1] For purposes of this statute, Florida courts have defined the term "homosexual" as being "limited to applicants who are known to engage in current, voluntary homosexual activity," thus drawing "a distinction between homosexual orientation and homosexual activity." Fla. Dep't of Health & Rehab. Servs. v. Cox, 627 So. 2d 1210, 1215 (Fla. Dist. Ct. App. 1993), aff'd in relevant part, 656 So. 2d 902, 903 (Fla. 1995). During the past twelve years, several legislative bills have attempted to repeal the statute,[2] and three separate legal challenges to it have been filed in the Florida courts.[3] To date, no attempt to overturn the provision has succeeded. We now consider the most recent challenge to the statute.

---

[1] Fla. Stat. § 63.042(3) provides: "No person eligible to adopt under this statute may adopt if that person is a homosexual."

[2] S.B. 752, Reg. Sess. (Fla. 1995); H.B. 349, Reg. Sess. (Fla. 1995); H.B. 1461, Reg. Sess. (Fla. 1993).

[3] See Cox, 627 So. 2d at 1210, aff'd in part, rev'd in part, and remanded, 656 So. 2d 902 (Fla. 1995); Amer v. Johnson, 4 Fla. L. Weekly Supp. 854b (Fla. Cir. Ct. 1997); Seebol v. Farie, 16 Fla. L. Weekly C52 (Fla. Cir. Ct. 1991).

B. The Litigants

Six plaintiffs-appellants bring this case. The first, Steven Lofton, is a registered pediatric nurse who has raised from infancy three Florida foster children, each of whom tested positive for HIV at birth. By all accounts, Lofton's efforts in caring for these children have been exemplary, and his story has been chronicled in dozens of news stories and editorials as well as on national television.[4] We confine our discussion of that story to those facts relevant to the legal issues before us and properly before us in the record. John Doe, also named as a plaintiff-appellant in this litigation, was born on 29 April 1991. Testing positive at birth for HIV and cocaine, Doe immediately entered the Florida foster care system. Shortly thereafter, Children's Home Society, a private agency, placed

---

[4] E.g., Jay Weaver, *Gays to Test Florida Law on Adoptions*, Miami Herald, March 4, 2003, at F1; *Advocates Say Keep Family at Center of Gay Adoption Battle*, Miami Times, Apr. 2, 2002, at 7A; Bruce Alpert, *Debate Over Ban on Gay Adoptions Grows*, Times-Picayune, Mar. 30, 2002, at Nat'l 1; Editorial, *Adoption by Loving Gay Parents*, St. Petersburg Times, Mar. 25, 2002, at 10A; Robert Scheer, Editorial, *Kids Get Left in the Lurch When the 'Values' Cops Arrive*, L.A. Times, Mar. 19, 2002, at Metro 13; Dana Canedy, *Groups Fight Florida's Ban on Gay Adoptions*, N.Y. Times, Mar. 15, 2002, at A12; *Good Morning America: Steve Lofton and Roger Croteau Discuss Rights of Gay Couples to Adopt Children* (ABC television broadcast, Mar. 14, 2002); *World News Tonight with Peter Jennings: Gay Couple's Struggle to Adopt Foster Children in Florida* (ABC television broadcast, Mar. 14, 2002); *Primetime Thursday: Rosie's Story* (ABC television broadcast, Mar. 14, 2002); Julie Sullivan, *Oregon Family at Vortex of Ban on Gay Adoption*, Oregonian, Mar. 14, 2002, at A1; Jeanne Malmgren, *Gay Adoption in Florida: It's Out of the Question*, St. Petersburg Times, Mar. 14, 2002, at 1D; Andres Viglucci, *Parents in Their Hearts, They Seek Approval of the Law*, Miami Herald, Aug. 31, 2001, at 6A; Tamar Lewin, *Court Backs Florida Ban on Adoption by Gays*, N.Y. Times, Aug. 31, 2001, at A14; Gail Epstein Nieves, *Foster Parent Challenges State Ban on Gay Adoption*, Miami Herald, July 21, 2001, at 1B; David Crary, *Gay Adoption Ban in Florida Faces Court Test*, L.A. Times, June 17, 2001, at A14; *All Things Considered: ACLU Plans Lawsuit Against Florida to Change a Law that Prohibits the Adoption of Children by Gay Men and Lesbians* (National Public Radio broadcast, May 26, 1999).

Doe in foster care with Lofton, who has extensive experience treating HIV patients. At eighteen months, Doe sero-reverted and has since tested HIV negative. In September of 1994, Lofton filed an application to adopt Doe but refused to answer the application's inquiry about his sexual preference and also failed to disclose Roger Croteau, his cohabitating partner, as a member of his household. After Lofton refused requests from the Department of Children and Families ("DCF") to supply the missing information, his application was rejected pursuant to the homosexual adoption provision. Shortly thereafter, in early 1995, William E. Adams, Jr., a professor of law who had participated in one of the previous legal challenges to Fla. Stat. § 63.042(3), wrote to the American Civil Liberties Union ("ACLU") and informed it that Lofton and Croteau would make "excellent test plaintiffs." R3-108 at 3. Two years later, in light of the length of Doe's stay in Lofton's household, DCF offered Lofton the compromise of becoming Doe's legal guardian. This arrangement would have allowed Doe to leave the foster care system and DCF supervision. However, because it would have cost Lofton over $300 a month in lost foster care subsidies and would have jeopardized Doe's Medicaid coverage, Lofton declined the guardianship option unless it was an interim stage toward adoption. Under Florida law, DCF could not accommodate this condition, and the present litigation ensued.

Plaintiff-appellant Douglas E. Houghton, Jr., is a clinical nurse specialist and legal guardian of plaintiff-appellant John Roe, who is eleven years old. Houghton has been Roe's caretaker since 1996 when Roe's biological father, suffering from alcohol abuse and frequent unemployment, voluntarily left Roe, then four years old, with Houghton. That same year, Houghton was appointed co-guardian of Roe along with one Robert Obeso (who otherwise has no involvement in this case). After Roe's biological father consented to termination of his parental rights, Houghton attempted to adopt Roe. Because of Houghton's homosexuality, however, he did not receive a favorable preliminary home study evaluation, which precluded him from filing the necessary adoption petition in state circuit court. Fla. Stat. §§ 63.092(3), 63.112(2)(b).

Plaintiff-appellants Wayne Larue Smith and Daniel Skahen, an attorney and real estate broker residing together in Key West, became licensed DCF foster parents after completing a requisite ten-week course in January of 2000. Since then, they have cared for three foster children, none of whom has been available for adoption. On 1 May 2000, Smith and Skahen submitted applications with DCF to serve as adoptive parents.[5] On their adoption applications, both Smith and Skahen indicated that they are homosexuals. On 15 May 2000, they received

_____

[5] Unlike Lofton and Houghton, neither of whose cohabitating partners seeks to join their respective adoptions, Smith and Skahen seek to adopt jointly.

6

notices from DCF stating that their applications had been denied because of their homosexuality.

C. Procedural History

Appellants filed suit in the United States District Court for the Southern District of Florida and named as defendants Kathleen A. Kearney and Charles Auslander in their respective official capacities as DCF Secretary and DCF District Administrator for Dade and Monroe Counties. Their complaint alleged that the statute violates appellants' fundamental rights and the principles of equal protection. Jointly, appellants asked the district court to declare Fla. Stat. § 63.042(3) unconstitutional and to enjoin its enforcement. Appellants also sought class certification on behalf of two purported classes: all similarly situated adults and all similarly situated children. The district court denied the request for class certification and granted summary judgment in favor of the state on all counts, thereby upholding the statute. It is from this judgment that appellants now appeal.

Appellants assert three constitutional arguments on appeal. First, appellants argue that the statute violates Lofton, Houghton, Doe, and Roe's rights to familial privacy, intimate association, and family integrity under the Due Process Clause of the Fourteenth Amendment. Second, appellants argue that the Supreme Court's recent decision in Lawrence v. Texas, 539 U.S. ___, 123 S. Ct. 2472 (2003), recognized a fundamental right to private sexual intimacy and that the Florida

7

statute, by disallowing adoption by individuals who engage in homosexual activity, impermissibly burdens the exercise of this right. Third, appellants allege that, by categorically prohibiting only homosexual persons from adopting children, the statute violates the Equal Protection Clause of the Fourteenth Amendment. Each of these challenges raises questions of first impression in this circuit.

## II. DISCUSSION

### A. Summary Judgment Standard

We review a summary judgment decision de novo and apply the same legal standard used by the district court. Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003). In conducting our review, we view all evidence and factual inferences in the light most favorable to the nonmoving party. Id. Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. Id.

B. Florida's Adoption Scheme

Appellants' challenge cannot be viewed apart from the context in which it arises. Under Florida law, "adoption is not a right; it is a statutory privilege." Cox, 627 So. 2d at 1216. Unlike biological parentage, which precedes and transcends formal recognition by the state, adoption is wholly a creature of the state. Cf. Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 845, 97 S. Ct. 2094, 2110 (1977) (noting that, unlike the natural family, which has "its origins entirely apart from the power of the State," the foster parent-child relationship "has its source in state law and contractual arrangements"); Lindley v. Sullivan, 889 F.2d 124, 131 (7th Cir. 1989) ("Because of its statutory basis, adoption differs from natural procreation in a most important and striking way.").

In formulating its adoption policies and procedures, the State of Florida acts in the protective and provisional role of in loco parentis for those children who, because of various circumstances, have become wards of the state. Thus, adoption law is unlike criminal law, for example, where the paramount substantive concern is not intruding on individuals' liberty interests, see, e.g., Lawrence, 539 U.S. ___, 123 S. Ct. 2472; Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705 (1973), and the paramount procedural imperative is ensuring due process and fairness, see, e.g., Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984); Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966); Gideon v. Wainwright, 372 U.S.

9

335, 83 S. Ct. 792 (1963). Adoption is also distinct from such contexts as government-benefit eligibility schemes or access to a public forum, where equality of treatment is the primary concern. See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 115 S. Ct. 2510 (1995); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S. Ct. 2097 (1995). By contrast, in the adoption context, the state's overriding interest is the best interests of the children whom it is seeking to place with adoptive families. In re Adoption of H.Y.T., 458 So. 2d 1127, 1128 (Fla. 1984) (noting that, in Florida adoption proceedings, "the court's primary duty is to serve the best interests of the child—the object of the proceeding").[6] Florida, acting parens patriae for children who have lost their natural parents, bears the high duty of determining what adoptive home environments will best serve all aspects of the child's growth and development.

Because of the primacy of the welfare of the child, the state can make classifications for adoption purposes that would be constitutionally suspect in many other arenas. For example, Florida law requires that, in order to adopt any child other than a special needs child, an individual's primary residence and place

---

[6] See also Rushing v. Bosse, 652 So. 2d 869, 873 (Fla. Dist. Ct. App. 1995) ("Adoption proceedings are unique. In an adoption proceeding, the intended beneficiary of the proceeding is the child to be adopted."); Amer, 4 Fla. L. Weekly Supp. 854b (noting that persons seeking to adopt "are merely requesting that the state make a decision to investigate the candidate's background to determine if their environment would serve the best interests of a child" and that "[i]n each adoption proceeding, the child is the intended beneficiary whose interest is afforded the utmost consideration").

of employment must be located in Florida. Fla. Stat. § 63.185. In screening adoption applicants, Florida considers such factors as physical and mental health, income and financial status, duration of marriage, housing, and neighborhood, among others. Fla. Admin. Code Ann. r. 65C-16.005(3) (2003). Similarly, Florida gives preference to candidates who demonstrate a commitment to "value, respect, appreciate, and educate the child regarding his or her racial and ethnic heritage." Id. Moreover, prospective adoptive parents are required to sign an affidavit of good moral character. Id. Many of these preferences and requirements, if employed outside the adoption arena, would be unlikely to withstand constitutional scrutiny. See, e.g., Troxel v. Granville, 530 U.S. 57, 68, 120 S. Ct. 2054, 2061 (2000) (recognizing that, absent neglect or abuse, the state may not "inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children"); Supreme Court of Va. v. Friedman, 487 U.S. 59, 70, 108 S. Ct. 2260, 2267 (1988) (invalidating as unconstitutional Virginia's residency requirement for waive-in admission to the state bar).

The decision to adopt a child is not a private one, but a public act. Cox, 627 So. 2d at 1216. At a minimum, would-be adoptive parents are asking the state to confer official recognition—and, consequently, the highest level of constitutional insulation from subsequent state interference, see Troxel, 530 U.S. at 65, 120 S. Ct.

11

at 2060—on a relationship where there exists no natural filial bond. In many cases, they also are asking the state to entrust into their permanent care a child for whom the state is currently serving as in loco parentis. In doing so, these prospective adoptive parents are electing to open their homes and their private lives to close scrutiny by the state.[7] Florida's adoption application requires information on a variety of private matters, including an applicant's physical and psychiatric medical history, previous marriages, arrest record, financial status, and educational history. In this regard, Florida's adoption scheme is like any "complex social welfare system that necessarily deals with the intimacies of family life." Bowen v. Gilliard, 483 U.S. 587, 602, 107 S. Ct. 3008, 3017-18 (1987) (quoting Califano v. Jobst, 434 U.S. 47, 55 n.11, 98 S. Ct. 95, 100 n.11 (1977)). Accordingly, such intrusions into private family matters are on a different constitutional plane than those that "seek[] to foist orthodoxy on the unwilling by banning or criminally prosecuting" nonconformity. Califano, 434 U.S. at 55 n.11, 98 S. Ct. at 100 n.11; cf. Lindley, 889 F.2d at 131 (declining to find a privacy

---

[7] See also Cox, 627 So. 2d at 1216 ("To make decisions that accord with the best interests of children, government agencies and courts are clearly entitled to conduct extensive examinations into the background of prospective parents."); In re Op. of the Justices, 530 A.2d 21, 27 (N.H. 1987) ("[W]e note that no intrusion by the state in this context is possible unless and until an individual invites it by voluntarily seeking to adopt . . . . Only then would the state pose questions about the individual's private life, as the agent responsible for preserving and furthering the welfare of its children.").

interest in adopting a child because state law "requires adopters to submit their personal lives to intensive scrutiny before the adoption may be approved").

In short, a person who seeks to adopt is asking the state to conduct an examination into his or her background and to make a determination as to the best interests of a child in need of adoption. In doing so, the state's overriding interest is not providing individuals the opportunity to become parents, but rather identifying those individuals whom it deems most capable of parenting adoptive children and providing them with a secure family environment. Indicative of the strength of the state's interest—indeed duty—in this context is the fact that appellants have not cited to us, nor have we found, a single precedent in which the Supreme Court or one of our sister circuits has sustained a constitutional challenge to an adoption scheme or practice by any individual other than a natural parent, and even many challenges by natural parents have failed. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S. Ct. 2985 (1983); Quilloin v. Walcott, 434 U.S. 246, 98 S. Ct. 549 (1978). Of course, despite their highly sensitive nature, adoption schemes are by no means immune from constitutional scrutiny, and we now consider the constitutionality of the Florida statute. See, e.g., Caban v. Mohammed, 441 U.S. 380, 99 S. Ct. 1760 (1979) (invalidating on equal protection grounds a state law permitting unwed mothers, but not unwed fathers, to block adoption of their child simply by withholding consent).

13

C. Appellants' Due Process Challenges

    1. Fundamental Right to "Family Integrity"

Neither party disputes that there is no fundamental right to adopt, nor any fundamental right to be adopted. R4-124 at 10 (Joint Pre-trial Stipulation); see also Mullins v. Oregon, 57 F.3d 789, 794 (9th Cir. 1995) ("[W]hatever claim a prospective adoptive parent may have to a child, we are certain that it does not rise to the level of a fundamental liberty interest."); Lindley, 889 F.2d at 131 ("[W]e are constrained to conclude that there is no fundamental right to adopt."). Both parties likewise agree that adoption is a privilege created by statute and not by common law. R4-124 at 10. Because there is no fundamental right to adopt or to be adopted, it follows that there can be no fundamental right to apply for adoption.

Nevertheless, appellants argue that, by prohibiting homosexual adoption, the state is refusing to recognize and protect constitutionally protected parent-child relationships between Lofton and Doe and between Houghton and Roe.[8] Noting that the Supreme Court has identified "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court," Troxel, 530 U.S. at 65, 120 S. Ct. at 2060, appellants argue that they are entitled to a similar constitutional liberty interest

---

[8] Because Smith and Skahen have no specific foster child or legal ward whom they are seeking to adopt, they do not, and need not, join in these arguments.

14

because they share deeply loving emotional bonds that are as close as those between a natural parent and child.[9] They further contend that this liberty interest is significantly burdened by the Florida statute, which prevents them from obtaining permanency in their relationships and creates uncertainty about the future integrity of their families. Only by being given the opportunity to adopt, appellants assert, will they be able to protect their alleged right to "family integrity."[10]

Although the text of the Constitution contains no reference to familial or parental rights, Supreme Court precedent has long recognized that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Id. at 66, 120 S. Ct. at 2060. A corollary to this right is the "private realm of family life which the state cannot enter that has been afforded both substantive and procedural protection." Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 842, 97 S. Ct. 2094, 2108 (1977) (internal citation

---

[9] On appeal, appellants argue that the district court erred in not allowing them to show that they have a constitutionally protected family relationship. The shortcoming in appellants' argument, however, is not factual, but legal. As we explain, appellants' emotional ties, regardless how strong and intense, do not by themselves create the constitutional rights appellants claim to have.

[10] As part of this argument, appellants assert that the state is denying them access to the panoply of constitutional and statutory protections that accompany legal adoption solely on the basis of their homosexuality. This is a restatement of their equal protection argument, which we address in Section II.D.

15

and quotation marks omitted). Historically, the Court's family- and parental-rights holdings have involved biological families. See, e.g., Troxel, 530 U.S. 57, 120 S. Ct. 2054 (2000); Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526 (1972); Stanley v. Illinois, 405 U.S. 645, 92 S. Ct. 1208 (1972); Pierce v. Soc'y of Sisters, 268 U.S. 510, 45 S. Ct. 571 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625 (1923). The Court itself has noted that "the usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." Smith, 431 U.S. at 843, 97 S. Ct. at 2109. Appellants, however, seize on a few lines of dicta from Smith, in which the Court acknowledged that "biological relationships are not [the] exclusive determination of the existence of a family," id., and noted that "[a]doption, for instance, is recognized as the legal equivalent of biological parenthood," id. at 844 n.51, 97 S. Ct. at 2109 & n.51. Extrapolating from Smith, appellants argue that parental and familial rights should be extended to individuals such as foster parents and legal guardians and that the touchstone of this liberty interest is not biological ties or official legal recognition, but the emotional bond that develops between and among individuals as a result of shared daily life.

We do not read Smith so broadly. In Smith, the Court considered whether the appellee foster families possessed a constitutional liberty interest in "the integrity of their family unit" such that the state could not disrupt the families

16

without procedural due process. Id. at 842, 97 S. Ct at 2108. Although the Court found it unnecessary to resolve that question, Justice Brennan, writing for the majority, did note that the importance of familial relationships stems not merely from blood relationships, but also from "the emotional attachments that derive from the intimacy of daily association." Id. at 844, 97 S. Ct. at 2109. The Smith Court went on, however, to discuss the "important distinctions between the foster family and the natural family," particularly the fact that foster families have their genesis in state law. Id. at 845, 97 S. Ct. at 2110. The Court stressed that the parameters of whatever potential liberty interest such families might possess would be defined by state law and the justifiable expectations it created. Id. at 845-46, 97 S. Ct. at 2110. The Court found that the expectations created by New York law— which accorded only limited recognition to foster families—supported only "the most limited constitutional 'liberty' in the foster family." Id. at 846, 97 S. Ct. at 2110. Basing its holding on other grounds, the Court concluded that the procedures provided under New York law were "adequate to protect whatever liberty interest appellees may have." Id. at 856, 97 S. Ct. at 2115.

In Drummond v. Fulton County Dep't of Family & Children's Servs., the former Fifth Circuit construed Smith's dicta in considering due process and equal protection claims brought by white foster parents challenging Georgia's refusal to permit them to adopt their mixed-race foster child, whom they had parented for

17

two years. 563 F.2d 1200, 1206 (5th Cir. 1977) (en banc), <u>cert.</u> <u>denied</u>, 437 U.S. 910, 98 S. Ct. 3103 (1978).[11] Arguing that theirs was a "psychological family," the foster parents advanced a theory identical to that of present appellants:

> Plaintiffs maintain that during the period Timmy lived with them mutual feelings of love and dependence developed which are analogous to those found in most biological families. By so characterizing their home situation they seek to come within the protection which courts have afforded to the family unit. They assert that their relationship to Timmy is part of the familial right to privacy which is a protected interest under the Fourteenth Amendment. As the "psychological parents" of Timmy, they claim entitlement to the parental rights referred to in numerous decisions.

<u>Id.</u> at 1206 (internal citation omitted). Relying on <u>Smith,</u> the <u>Drummond</u> court rejected plaintiffs' argument. Examining state law to determine the extent of plaintiffs' constitutional interests, the court found that "[t]here is no basis in the Georgia law, which creates the foster relationship, for a justifiable expectation that the relationship will be left undisturbed." <u>Id.</u> at 1207. The <u>Drummond</u> court stated:

> The very fact that the relationship before us is a creature of state law, as well as the fact that it has never been recognized as equivalent to either the natural family or the adoptive family by any court, demonstrates that it is not a protected liberty interest, but an interest limited by the very laws which create it.

<u>Id.</u>; <u>accord</u> <u>Mullins</u>, 57 F.3d at 794 (holding that biological grandparents possessed no liberty interest in adopting two of their grandchildren who were available for

---

[11] In <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to 1 October 1981.

18

adoption); Procopio v. Johnson, 994 F.2d 325, 329 (7th Cir. 1993) (relying on Smith and holding that "[n]otwithstanding the preference that state law grants to foster families seeking to adopt their foster children, this priority does not rise to the level of an entitlement or expectancy").

Neither Smith nor Drummond, however, categorically foreclosed the possibility that, under exceptional circumstances, a foster family could possess some degree of constitutional protection if state law created a "justifiable expectation" of family unit permanency. Drummond, 563 F.2d at 1207. Here, we find that under Florida law neither a foster parent nor a legal guardian could have a justifiable expectation of a permanent relationship with his or her child free from state oversight or intervention. Under Florida law, foster care is designed to be a short-term arrangement while the state attempts to find a permanent adoptive home.[12] For instance, Florida law permits foster care as a "permanency option" only for children at least fourteen years of age, Fla. Stat. § 39.623(1), and DCF may remove a foster child anytime that it believes it to be in the child's best interests, id. § 409.165(3)(f). Similarly, legal guardians in Florida are subject to ongoing judicial oversight, including the duty to file annual guardianship reports

---

[12] Although there are undoubtedly situations in which foster care becomes a permanent placement, "it is hard to 'believe that such breakdowns of the . . . system must be protected or forever frozen in their existence by the Due Process Clause of the Fourteenth Amendment.'" Drummond v. Fulton County Dep't of Family & Children's Servs., 563 F.2d 1200, 1207 (5th Cir. 1977) (quoting Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 862, 97 S. Ct. 2094, 2119 (1977) (Stewart, J., concurring)).

and annual review by the appointing court, id. §§ 744.361-372, and can be removed for a wide variety of reasons, id. § 744.474 (permitting removal of a guardian for such causes as incapacity, illness, substance abuse, conviction of a felony, failure to file annual guardianship reports, and failure to fulfill guardianship education requirements). In both cases, the state is not interfering with natural family units that exist independent of its power, but is regulating ones created by it. Lofton and Houghton entered into relationships to be a foster parent and legal guardian, respectively, with an implicit understanding that these relationships would not be immune from state oversight and would be permitted to continue only upon state approval. The emotional connections between Lofton and his foster child and between Houghton and his ward originate in arrangements that have been subject to state oversight from the outset. We conclude that Lofton, Doe, Houghton, and Roe could have no justifiable expectation of permanency in their relationships. Nor could Lofton and Houghton have developed expectations that they would be allowed to adopt, in light of the adoption provision itself.

Even if Florida law did create an expectation of permanency, appellants misconstrue the nature of the liberty interest that it would confer upon them. The resulting liberty interest at most would provide *procedural* due process protection in the event the state were to attempt to remove Doe or Roe. See Smith, 431 U.S. at 845, 97 S. Ct. at 2110 (considering whether foster families' asserted liberty

interest in remaining intact warranted greater procedural safeguards than were currently provided under New York law); Drummond, 563 F.2d at 1204 (considering, if foster family possesses constitutional rights, "how much procedural protection is required in order to safeguard them?"). Such a procedural right does not translate, however, into a substantive right to be free from state inference. Nor does it create an affirmative right to be accorded official recognition as "parent" and "child." Cf. Harris v. McRae, 448 U.S. 297, 100 S. Ct. 2671 (1980) (holding that the government's refusal to subsidize the exercise of a constitutional right does not constitute a violation of that right); Webster v. Reprod. Health Servs., 492 U.S. 490, 109 S. Ct. 3040 (1989) (same); Mullins, 57 F.3d at 794 ("A negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth."). In sum, Florida's statute by itself poses no threat to whatever hypothetical constitutional protection foster families and guardian-ward relationships may possess.

We conclude that appellants' right-to-family-integrity argument fails to state a claim. There is no precedent for appellants' novel proposition that long-term foster care arrangements and guardianships are entitled to constitutional protection akin to that accorded to natural and adoptive families. Moreover, we decline appellants' invitation to recognize a new fundamental right to family integrity for

21

groups of individuals who have formed deeply loving and interdependent relationships. Under appellants' theory, any collection of individuals living together and enjoying strong emotional bonds could claim a right to legal recognition of their family unit, and every removal of a child from a long-term foster care placement—or simply the state's failure to give long-term foster parents the opportunity to adopt—would give rise to a constitutional claim. Such an expansion of the venerable right of parental control would well exceed our judicial mandate as a lower federal court. See Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1992) (noting that the doctrine of judicial restraint requires even the Supreme Court to exercise "the utmost care" whenever asked to break new ground in the field of fundamental rights).

2. Fundamental Right to "Private Sexual Intimacy"

Laws that burden the exercise of a fundamental right require strict scrutiny and are sustained only if narrowly tailored to further a compelling government interest. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 388, 98 S. Ct. 673, 682 (1978); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S. Ct. 1322, 1331 (1969). Appellants argue that the Supreme Court's recent decision in Lawrence v. Texas, 539 U.S. ___, 123 S. Ct. 2472 (2003), which struck down Texas's sodomy statute, identified a hitherto unarticulated fundamental right to private sexual intimacy. They contend that the Florida statute, by disallowing adoption to any individual

22

who chooses to engage in homosexual conduct, impermissibly burdens the exercise of this right.

We begin with the threshold question of whether <u>Lawrence</u> identified a new fundamental right to private sexual intimacy. <u>Lawrence</u>'s holding was that substantive due process does not permit a state to impose a criminal prohibition on private consensual homosexual conduct. The effect of this holding was to establish a greater respect than previously existed in the law for the right of consenting adults to engage in private sexual conduct. 539 U.S. at ___, 123 S. Ct. at 2478. Nowhere, however, did the Court characterize this right as "fundamental." <u>Cf.</u> <u>id.</u> at ___, 123 S. Ct. at 2488 (Scalia, J., dissenting) (observing that "nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause"). Nor did the Court locate this right directly in the Constitution, but instead treated it as the by-product of several different constitutional principles and liberty interests.[13]

---

[13] The Court's language suggested that this right emerges from the confluence of several factors, namely, (1) the broad concepts of liberty located in the Due Process Clause, <u>see, e.g.,</u> <u>Lawrence v. Texas</u>, 539 U.S. ___, ___,123 S. Ct. 2472, 2475 (2003) ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places."); <u>id.</u> ("The instant case involves liberty of the person both in its spatial and more transcendent dimensions."); <u>id.</u> at ___, 123 S. Ct. at 2484 ("[T]here is a realm of personal liberty which the government may not enter.") (citation omitted); (2) a cluster of specific constitutional rights closely <i>related</i> to sexual intimacy, <u>id.</u> at ___, 123 S. Ct. at 2481 (noting the constitutional protection of decisions relating to sexual intimacy, including rights involving "marriage, procreation, contraception, family relationships, child rearing, and education"); and (3) Texas's failure to offer a rational basis for its statute, <u>id.</u> at ___, 123 S. Ct. at 2484 ("The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.").

We are particularly hesitant to infer a new fundamental liberty interest from an opinion whose language and reasoning are inconsistent with standard fundamental-rights analysis. The Court has noted that it must "exercise the utmost care whenever [it is] asked to break new ground" in the field of fundamental rights, Washington v. Glucksberg, 521 U.S. 702, 720, 117 S. Ct. 2258, 2268 (1997) (citation omitted), which is precisely what the Lawrence petitioners and their amici curiae had asked the Court to do.[14] That the Court declined the invitation is apparent from the absence of the "two primary features" of fundamental-rights analysis in its opinion. Glucksberg, 521 U.S. at 720, 117 S. Ct. at 2268. First, the Lawrence opinion contains virtually no inquiry into the question of whether the petitioners' asserted right is one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id. at 720-21, 117 S. Ct. at 2268 (internal citations and quotation marks omitted).[15] Second, the opinion notably never provides the

___

[14] See Tr. of Oral Argument, No. 02-102, at *4; Br. of the ACLU et al. as Amici Curiae, No. 02-102, at *11-25.

[15] The Court did devote considerable attention to history and tradition. This examination, however, was for the purpose of challenging the historical premises relied upon by the Bowers Court, and it focused on whether there has been a history of enacting, and regularly enforcing, laws specifically directed at private homosexual conduct. Lawrence, 539 U.S. at ___, 123 S. Ct. at 2478-81. Notably absent from this discussion was the critical inquiry for purposes of fundamental-rights analysis: whether there has been a deeply rooted tradition and history of *protecting* the right to homosexual sodomy or the right to private sexual intimacy.

24

"'careful description' of the asserted fundamental liberty interest" that is to accompany fundamental-rights analysis. Id. at 721, 117 S. Ct. at 2268 (citation omitted); see also Reno v. Flores, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993) ("'Substantive due process' analysis must begin with a careful description of the asserted right . . . ."). Rather, the constitutional liberty interests on which the Court relied were invoked, not with "careful description," but with sweeping generality. See, e.g., Lawrence, 539 U.S. ___, 123 S. Ct. at 2475 ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places."); id. ("The instant case involves liberty of the person both in its spatial and more transcendent dimensions."); id. at ___, 123 S. Ct. at 2484 ("[T]here is a realm of personal liberty which the government may not enter.") (citation omitted). Most significant, however, is the fact that the Lawrence Court never applied strict scrutiny, the proper standard when fundamental rights are implicated, but instead invalidated the Texas statute on rational-basis grounds, holding that it "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." Id. at ___, 123 S. Ct. at 2484; see also id. at ___, 123 S. Ct. at 2488 (Scalia, J., dissenting) (observing that the majority opinion did not "subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy *were* a 'fundamental right'").

25

We conclude that it is a strained and ultimately incorrect reading of Lawrence to interpret it to announce a new fundamental right. Accordingly, we need not resolve the second prong of appellants' fundamental-rights argument: whether exclusion from the statutory privilege of adoption because of appellants' sexual conduct creates an impermissible burden on the exercise of their asserted right to private sexual intimacy. Cf. Lyng v. Castillo, 477 U.S. 635, 638, 106 S. Ct. 2727, 2729 (1986) (only classifications that "'directly and substantially' interfere" with a fundamental right constitute an impermissible "burden") (citation omitted).

Moreover, the holding of Lawrence does not control the present case. Apart from the shared homosexuality component, there are marked differences in the facts of the two cases. The Court itself stressed the limited factual situation it was addressing in Lawrence:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.

Lawrence, 539 U.S. at ___, 123 S. Ct. at 2484. Here, the involved actors are not only consenting adults, but minors as well. The relevant state action is not criminal prohibition, but grant of a statutory privilege. And the asserted liberty

26

interest is not the negative right to engage in private conduct without facing criminal sanctions, but the affirmative right to receive official and public recognition. Hence, we conclude that the Lawrence decision cannot be extrapolated to create a right to adopt for homosexual persons.

D. Appellants' Equal Protection Challenge

1. Rational-Basis Review

The Equal Protection Clause of the Fourteenth Amendment proclaims that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. The central mandate of the equal protection guarantee is that "[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." Lehr v. Robertson, 463 U.S. 248, 265, 103 S. Ct. 2985, 2995 (1983). Equal protection, however, does not forbid legislative classifications. Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992). "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Id. Unless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest. Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627 (1996). As we have explained, Florida's statute burdens no fundamental rights. Moreover, all of our

27

sister circuits that have considered the question have declined to treat homosexuals as a suspect class.[16] Because the present case involves neither a fundamental right nor a suspect class, we review the Florida statute under the rational-basis standard.

Rational-basis review, "a paradigm of judicial restraint," does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313-14, 113 S. Ct. 2096, 2101 (1993) (citation omitted). The question is simply whether the challenged legislation is rationally related to a legitimate state interest. Heller v. Doe, 509 U.S. 312, 320, 113 S. Ct. 2637, 2642 (1993). Under this deferential standard, a legislative classification "is accorded a strong presumption of validity," id. at 319, 113 S. Ct. at 2642, and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," id. at 320, 113 S. Ct. at 2642 (citation omitted). This holds true "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer, 517 U.S. at 632, 116 S. Ct. at 1627. Moreover, a state has "no obligation to produce evidence to sustain the

---

[16] Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289 (6th Cir. 1997); Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126 (9th Cir. 1997); Richenberg v. Perry, 97 F.3d 256 (7th Cir. 1996); Thomasson v. Perry, 80 F.3d 915 (4th Cir. 1996); Steffan v. Perry, 41 F.3d 677 (D.C. Cir. 1994); High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir. 1990); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir. 1989); Woodward v. United States, 871 F.2d 1068 (Fed. Cir. 1989); Town of Ball v. Rapides Parish Police Jury, 746 F.2d 1049 (5th Cir. 1984); Rich v. Sec'y of the Army, 735 F.2d 1220 (10th Cir.1984).

rationality of a statutory classification." Heller, 509 U.S. at 320, 113 S. Ct. at 2643. Rather, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." Id. at 320-21, 113 S. Ct. at 2643 (citation omitted).

2. Florida's Asserted Rational Bases

Cognizant of the narrow parameters of our review, we now analyze the challenged Florida law. Florida contends that the statute is only one aspect of its broader adoption policy, which is designed to create adoptive homes that resemble the nuclear family as closely as possible. Florida argues that the statute is rationally related to Florida's interest in furthering the best interests of adopted children by placing them in families with married mothers and fathers. Such homes, Florida asserts, provide the stability that marriage affords and the presence of both male and female authority figures, which it considers critical to optimal childhood development and socialization. In particular, Florida emphasizes a vital role that dual-gender parenting plays in shaping sexual and gender identity and in providing heterosexual role modeling. Florida argues that disallowing adoption into homosexual households, which are necessarily motherless or fatherless and

29

lack the stability that comes with marriage, is a rational means of furthering Florida's interest in promoting adoption by marital families.[17]

Florida clearly has a legitimate interest in encouraging a stable and nurturing environment for the education and socialization of its adopted children. See, e.g., Palmore v. Sidoti, 466 U.S. 429, 433, 104 S. Ct. 1879, 1882 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years."); Stanley, 405 U.S. at 652, 92 S. Ct. at 1213 (noting that "protect[ing] the moral, emotional, mental, and physical welfare of the minor" is a "legitimate interest[], well within the power of the State to implement") (internal quotation marks omitted). It is chiefly from parental figures that children learn about the world and their place in it, and the formative influence of parents

---

[17] Florida also asserts that the statute is rationally related to its interest in promoting public morality both in the context of child rearing and in the context of determining which types of households should be accorded legal recognition as families. Appellants respond that public morality cannot serve as a legitimate state interest. Because of our conclusion that Florida's interest in promoting married-couple adoption provides a rational basis, it is unnecessary for us to resolve the question. We do note, however, the Supreme Court's conclusion that there is not only a legitimate interest, but "a substantial government interest in protecting order and morality," Barnes v. Glen Theatre, Inc., 501 U.S. 560, 569, 111 S. Ct. 2456, 2462 (1991), and its observation that "[i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." Gregg v. Georgia, 428 U.S. 153, 175, 96 S. Ct. 2909, 2926 (1976) (plurality opinion) (citation omitted).

We also note that our own recent precedent has unequivocally affirmed the furtherance of public morality as a legitimate state interest. See, e.g., Williams v. Pryor, 240 F.3d 944, 949 (11th Cir. 2001) ("The crafting and safeguarding of public morality has long been an established part of the States' plenary police power to legislate and indisputably is a legitimate government interest under rational basis scrutiny."); see also id. at 949 n.3 ("In fact, the State's interest in public morality is sufficiently substantial to satisfy the government's burden under the more rigorous intermediate level of constitutional scrutiny applicable in some cases.").

extends well beyond the years spent under their roof, shaping their children's psychology, character, and personality for years to come. In time, children grow up to become full members of society, which they in turn influence, whether for good or ill. The adage that "the hand that rocks the cradle rules the world" hardly overstates the ripple effect that parents have on the public good by virtue of their role in raising their children. It is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society—particularly when those future citizens are displaced children for whom the state is standing in loco parentis.

More importantly for present purposes, the state has a legitimate interest in encouraging this optimal family structure by seeking to place adoptive children in homes that have both a mother and father. Florida argues that its preference for adoptive marital families is based on the premise that the marital family structure is more stable than other household arrangements and that children benefit from the presence of both a father and mother in the home. Given that appellants have offered no competent evidence to the contrary, we find this premise to be one of those "unprovable assumptions" that nevertheless can provide a legitimate basis for legislative action. Paris Adult Theatre I v. Slaton, 413 U.S. 49, 62-63, 93 S. Ct. 2628, 2638 (1973). Although social theorists from Plato to Simone de Beauvoir

31

have proposed alternative child-rearing arrangements, none has proven as enduring as the marital family structure, nor has the accumulated wisdom of several millennia of human experience discovered a superior model. See, e.g., Plato, The Republic, Bk. V, 459d-461e; Simone de Beauvoir, The Second Sex (H. M. Parshley trans., Vintage Books 1989) (1949). Against this "sum of experience," it is rational for Florida to conclude that it is in the best interests of adoptive children, many of whom come from troubled and unstable backgrounds, to be placed in a home anchored by both a father and a mother. Paris Adult Theatre I, 413 U.S. at 63, 93 S. Ct. at 2638.

3. Appellants' Arguments

Appellants offer little to dispute whether Florida's preference for marital adoptive families is a legitimate state interest. Instead, they maintain that the statute is not rationally related to this interest. Arguing that the statute is both overinclusive and underinclusive, appellants contend that the real motivation behind the statute cannot be the best interest of adoptive children.

In evaluating this argument, we note from the outset that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." Beach Communications, 508 U.S. at 315, 113 S. Ct. at 2102; see also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S. Ct. 925, 929 (1986) ("It is a familiar principle of

32

constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.") (citation omitted). Instead, the question before us is whether the Florida legislature *could* have reasonably believed that prohibiting adoption into homosexual environments would further its interest in placing adoptive children in homes that will provide them with optimal developmental conditions. See Panama City Med. Diagnostic Ltd. v. Williams, 13 F.3d 1541, 1545 (11th Cir. 1994) ("The task is to determine if any set of facts may be reasonably conceived of to justify the legislation."). Unless appellants' evidence, which we view on summary judgment review in the light most favorable to appellants, can negate every plausible rational connection between the statute and Florida's interest in the welfare of its children, we are compelled to uphold the statute. See Vance v. Bradley, 440 U.S. 93, 111, 99 S. Ct. 939, 949 (1979) ("In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."). We turn now to appellants' specific arguments.

a. Adoption by Unmarried Heterosexual Persons

Appellants note that Florida law permits adoption by unmarried individuals and that, among children coming out the Florida foster care system, 25% of

adoptions are to parents who are currently single. Their argument is that homosexual persons are similarly situated to unmarried persons with regard to Florida's asserted interest in promoting married-couple adoption. According to appellants, this disparate treatment lacks a rational basis and, therefore, disproves any rational connection between the statute and Florida's asserted interest in promoting adoption into married homes. Citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S. Ct. 3249 (1985), appellants argue that the state has not satisfied Cleburne's threshold requirement that it demonstrate that homosexuals pose a unique threat to children that others similarly situated in relevant respects do not.[18]

---

[18] Appellants also point to the fact that, in addition to single parents, substance abusers and perpetrators of domestic violence are not *categorically* excluded from adopting under Florida law. Appellants, however, have offered no evidence that such individuals are in reality ever permitted to adopt in Florida and actually have stipulated to the contrary. Appellants stipulated pre-trial that "[p]ersons with substance abuse problems are excluded from adopting children in Florida if it is determined that the abuse threatens the child." R4-124 at 4. Likewise, appellants stipulated that Florida law categorically excludes from adopting children those convicted of certain crimes of domestic violence. See id. Moreover, Florida law bars foster care and adoptive placement by DCF

> 1. In any case in which a record check reveals a felony conviction for child abuse, abandonment, or neglect; for spousal abuse; for a crime against children, including child pornography, or for a crime involving violence, including rape, sexual assault, or homicide but not including other physical assault or battery, if the department finds that a court of competent jurisdiction has determined that the felony was committed at any time; and
> 2. In any case in which a record check reveals a felony conviction for physical assault, battery, or a drug-related offense, if the department finds that a court of competent jurisdiction has determined that the felony was committed within the past 5 years.

Fla. Stat. § 435.045(1)(a).

We find appellants' reading of Cleburne to be an unwarranted interpretation. In Cleburne, the Supreme Court invalidated under the rational-basis test a municipal zoning ordinance requiring a group home for the mentally retarded to obtain a special use permit. Id. at 435, 105 S. Ct. at 3252. The municipality argued that it had a legitimate interest in (1) protecting the residents of the home from a nearby flood plain, (2) limiting potential liability for acts of residents of the home, (3) maintaining low-density land uses in the neighborhood, (4) reducing congestion in neighborhood streets, and (5) avoiding fire hazards. Id. at 449-50, 105 S. Ct. at 3259-60. The Court, however, found that the municipality failed to distinguish how these concerns applied particularly to mentally retarded residents of the home and not to a number of other persons who could freely occupy the identical structure without a permit, such as boarding houses, fraternity houses, and nursing homes. Id. The Court concluded that the purported justifications for the ordinance made no sense in light of how it treated other groups similarly situated. Id. at 450, 105 S. Ct. at 3260. Appellants have overstated Cleburne's holding by asserting that it places a burden on the State of Florida to show that homosexuals pose a greater threat than other unmarried adults who are allowed to adopt. The Cleburne Court reasserted the unremarkable principle that, when a statute imposes a classification on a particular group, its failure to impose the same classification on "other groups similarly situated in relevant respects" can be probative of a lack

of a rational basis. <u>Bd. of Trustees of the Univ. of Alabama v. Garrett</u>, 531 U.S. 356, 366 n.4, 121 S. Ct. 955, 963 n.4 (2001) (explaining <u>Cleburne</u>'s rationale); <u>see also</u> <u>Nordlinger</u>, 505 U.S. at 10, 112 S. Ct. at 2331 (noting that disparate treatment is permissible unless differently treated classes "are in *all* relevant respects alike") (emphasis added).

This case is distinguishable from <u>Cleburne</u>. The Florida legislature could rationally conclude that homosexuals and heterosexual singles are not "similarly situated in relevant respects." It is not irrational to think that heterosexual singles have a markedly greater probability of eventually establishing a married household and, thus, providing their adopted children with a stable, dual-gender parenting environment. Moreover, as the state noted, the legislature could rationally act on the theory that heterosexual singles, even if they never marry, are better positioned than homosexual individuals to provide adopted children with education and guidance relative to their sexual development throughout pubescence and adolescence.[19] In a previous challenge to Florida's statute, a Florida appellate court observed:

---

[19] The New Hampshire Supreme Court, in considering the constitutionality of a similar prohibition on homosexual adoption, concluded that the prohibition was rationally related to the state's desire "to provide appropriate role models for children" in the development of their sexual and gender identities. <u>In re Op. of the Justices</u>, 530 A.2d 21, 25 (N.H. 1987). That court noted that "the source of sexual orientation is still inadequately understood and is thought to be a combination of genetic and environmental influences. Given the reasonable possibility of environmental influences, we believe that the legislature can rationally act on the theory that a role model can influence the child's developing sexual identity." <u>Id.</u> (citation omitted).

> [W]hatever causes a person to become a homosexual, it is clear that the state cannot know the sexual preferences that a child will exhibit as an adult. Statistically, the state does know that a very high percentage of children available for adoption will develop heterosexual preferences. As a result, those children will need education and guidance after puberty concerning relationships with the opposite sex. In our society, we expect that parents will provide this education to teenagers in the home. These subjects are often very embarrassing for teenagers and some aspects of the education are accomplished by the parents telling stories about their own adolescence and explaining their own experiences with the opposite sex. It is in the best interests of a child if his or her parents can personally relate to the child's problems and assist the child in the difficult transition to heterosexual adulthood. Given that adopted children tend to have some developmental problems arising from adoption or from their experiences prior to adoption, it is perhaps more important for adopted children than other children to have a stable heterosexual household during puberty and the teenage years.

Cox, 627 So. 2d at 1220. "It could be that the assumptions underlying these rationales are erroneous, but the very fact that they are arguable is sufficient, on rational-basis review, to immunize the legislative choice from constitutional challenge." Heller, 509 U.S. at 333, 113 S. Ct. at 2649-50 (citation and internal punctuation marks omitted). Although the influence of environmental factors in forming patterns of sexual behavior and the importance of heterosexual role models are matters of ongoing debate, they ultimately involve empirical disputes not readily amenable to judicial resolution—as well as policy judgments best exercised in the legislative arena. For our present purposes, it is sufficient that these considerations provide a reasonably conceivable rationale for Florida to preclude all homosexuals, but not all heterosexual singles, from adopting.

37

The possibility, raised by appellants, that some homosexual households, including those of appellants, would provide a better environment than would some heterosexual single-parent households does not alter our analysis. The Supreme Court repeatedly has instructed that neither the fact that a classification may be overinclusive or underinclusive nor the fact that a generalization underlying a classification is subject to exceptions renders the classification irrational.[20] "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Id. at 321, 113 S. Ct. at 2643. We conclude that there are plausible rational reasons for the disparate treatment of homosexuals and heterosexual singles under Florida adoption law and that, to the extent that the classification may be imperfect, that imperfection does not rise to the level of a constitutional infraction.

### b. Current Foster Care Population

Appellants make much of the fact that Florida has over three thousand children who are currently in foster care and, consequently, have not been placed

---

[20] See, e.g., Beach Communications, 508 U.S. at 315-16, 113 S. Ct. at 2102 (noting that defining legislative classes "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration") (citation omitted); Vance, 440 U.S. at 108, 99 S. Ct. at 948 ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required.") (internal quotation marks omitted); Village of Belle Terre v. Boraas, 416 U.S. 1, 8, 94 S. Ct. 1536, 1540 (1974) ("[E]very line drawn by a legislature leaves some out

with permanent adoptive families. According to appellants, because excluding homosexuals from the pool of prospective adoptive parents will not create more eligible married couples to reduce the backlog, it is impossible for the legislature to believe that the statute advances the state's interest in placing children with married couples.

We do not agree that the statute does not further the state's interest in promoting nuclear-family adoption because it may delay the adoption of some children. Appellants misconstrue Florida's interest, which is not simply to place children in a permanent home as quickly as possible, but, when placing them, to do so in an optimal home, i.e., one in which there is a heterosexual couple or the potential for one. According to appellants' logic, every restriction on adoptive-parent candidates, such as income, in-state residency, and criminal record—none of which creates more available married couples—are likewise constitutionally suspect as long as Florida has a backlog of unadopted foster children. The best interests of children, however, are not automatically served by adoption into *any* available home merely because it is permanent. Moreover, the legislature could rationally act on the theory that not placing adoptees in homosexual households increases the probability that these children eventually will be placed with married-

---

that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.").

39

couple families, thus furthering the state's goal of optimal placement. Therefore, we conclude that Florida's current foster care backlog does not render the statute irrational.

### c. Foster Care and Legal Guardianship

Noting that Florida law permits homosexuals to become foster parents and permanent guardians, appellants contend that this fact demonstrates that Florida must not truly believe that placement in a homosexual household is not in a child's best interests.[21] We do not find that the fact that Florida has permitted homosexual foster homes and guardianships defeats the rational relationship between the statute and the state's asserted interest. We have not located and appellants have not cited any precedent indicating that a disparity between a law and its enforcement is a relevant consideration on rational-basis review, which only asks whether the legislature could have reasonably thought that the challenged law would further a legitimate state interest. Thus, to the extent that foster care and guardianship placements with homosexuals are the handiwork of Florida's executive branch, they are irrelevant to the question of the *legislative* rationale for Florida's adoption

---

[21] Aside from their own situations, appellants have offered no competent evidence as to the extent of homosexual foster homes and guardianships in Florida. Florida asserts, and appellants do not dispute, that in discovery it was able to locate only one known homosexual foster parent, aside from present parties, in all of Dade and Monroe Counties.

scheme.[22] To the extent that these placements are the product of an intentional legislative choice to treat foster care and guardianships differently than adoption, the distinction is not an irrational one. Indeed, it bears a rational relationship to Florida's interest in promoting the nuclear-family model of adoption since foster care and guardianship have neither the permanence nor the societal, cultural, and legal significance as does adoptive parenthood, which is the legal equivalent of natural parenthood. Fla. Stat. § 63.032(2).

Foster care and legal guardianship are designed to address a different situation than permanent adoption, and "the legislature must be allowed leeway to approach a perceived problem incrementally." Beach Communications, 508 U.S. at 316, 113 S. Ct. at 2102. The fact that "[t]he legislature may select one phase of one field and apply a remedy there, neglecting the others," does not render the legislative solution invalid. Id. (citation omitted); Heller, 509 U.S. at 321, 113 S. Ct. 2643 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.") (citation omitted). We conclude that the rationality of the statute is not defeated by

_____

[22] For similar reasons, we find inapposite appellants' proffer of the deposition testimony of DCF personnel acknowledging that they were personally unaware of any harms to children caused by having homosexual parents. Even if these statements of personal opinion can be charged to DCF (whose official position throughout this litigation has been to the contrary), they are irrelevant to the question of whether the Florida *legislature* could have had a rational basis for enacting the statute.

the fact that Florida permits homosexual persons to serve as foster parents and legal guardians.

d. Social Science Research

Appellants cite recent social science research and the opinion of mental health professionals and child welfare organizations as evidence that there is no child welfare basis for excluding homosexuals from adopting.[23] They argue that the cited studies show that the parenting skills of homosexual parents are at least equivalent to those of heterosexual parents and that children raised by homosexual parents suffer no adverse outcomes. Appellants also point to the policies and practices of numerous adoption agencies that permit homosexual persons to adopt.

In considering appellants' argument, we must ask not whether the latest in social science research and professional opinion *support* the decision of the Florida legislature, but whether that evidence is so well established and so far beyond dispute that it would be irrational for the Florida legislature to believe that the interests of its children are best served by not permitting homosexual adoption. Also, we must credit any conceivable rational reason that the legislature might have for choosing not to alter its statutory scheme in response to this recent social

_____

[23] For the sake of simplicity, our discussion here will attribute to appellants not only their own arguments but also the arguments made in the amicus brief filed jointly on their behalf by the Child Welfare League of America, Children's Rights, Inc., the Evan B. Donaldson Adoption Institute, and the National Center for Youth Law.

science research. We must assume, for example, that the legislature might be

aware of the critiques of the studies cited by appellants—critiques that have

highlighted significant flaws in the studies' methodologies and conclusions, such

as the use of small, self-selected samples; reliance on self-report instruments;

politically driven hypotheses; and the use of unrepresentative study populations

consisting of disproportionately affluent, educated parents.[24] Alternatively, the

legislature might consider and credit other studies that have found that children

raised in homosexual households fare differently on a number of measures, doing

worse on some of them, than children raised in similarly situated heterosexual

households.[25] Or the legislature might consider, and even credit, the research cited

by appellants, but find it premature to rely on a very recent and still developing

---

[24] See, e.g., D. Baumrind, Commentary on Sexual Orientation: Research and Social Policy Implications, 31 Developmental Psychol. 130 (No. 1, 1995) (reviewing various studies and questioning them on "theoretical and empirical grounds" because of flaws such as small sample sizes, reliance on self-report instruments, and self-selected, unrepresentative study populations); R. Lerner & A.K. Nagai, No Basis: What the Studies Don't Tell Us About Same-Sex Parenting, Marriage Law Project (Jan. 2001) (reviewing forty-nine studies on same-sex parenting and finding recurring methodological flaws, including failure to use testable hypotheses, lack of control methods, unrepresentative study populations, self-selected sample groups, and use of negative hypotheses); J. Stacey & T. Biblarz, (How) Does the Sexual Orientation of Parents Matter, 66 Am. Soc. Rev. 159, 166 (2001) (reviewing 21 studies and finding various methodological flaws, leading authors to conclude that "there are no studies of child development based on random, representative samples" of same-sex households).

[25] See, e.g., K. Cameron & P. Cameron, Homosexual Parents, 31 Adolescence 757, 770-774 (1996) (reporting study findings that children raised by homosexual parents suffer from disproportionately high incidence of emotional disturbance and sexual victimization); Stacey & Biblarz, supra, at 170 (concluding, based on study results, that "parental sexual orientation is positively associated with the possibility that children will attain a similar orientation, and theory and common sense also support such a view").

body of research, particularly in light of the absence of longitudinal studies following child subjects into adulthood and of studies of adopted, rather than natural, children of homosexual parents.[26]

We do not find any of these possible legislative responses to be irrational. Openly homosexual households represent a very recent phenomenon, and sufficient time has not yet passed to permit any scientific study of how children raised in those households fare as adults. Scientific attempts to study homosexual parenting in general are still in their nascent stages and so far have yielded inconclusive and conflicting results. Thus, it is hardly surprising that the question of the effects of homosexual parenting on childhood development is one on which even experts of good faith reasonably disagree. Given this state of affairs, it is not irrational for the Florida legislature to credit one side of the debate over the other. Nor is it irrational for the legislature to proceed with deliberate caution before

---

[26] We also note Justice Cordy's extensive, and persuasive, discussion of the currently available body of research on the question of homosexual parenting in his dissenting opinion in Goodridge v. Dep't of Health, No. SJC-08860, 2003 Mass. LEXIS 814 (Mass. Nov. 18, 2003). After surveying the early findings, as well as the critiques, of that research (much of which was also proffered by the parties and amici curiae in this case), Justice Cordy concludes:

> Taking all of this available information into account, the Legislature could rationally conclude that a family environment with married opposite-sex parents remains the optimal social structure in which to bear children, and that the raising of children by same-sex couples, who by definition cannot be the two sole biological parents of a child and cannot provide children with a parental authority figure of each gender, presents an alternative structure for child rearing that has not yet proved itself beyond reasonable scientific dispute to be as optimal as the biologically based marriage norm.

Id. at *163 (Cordy, J., dissenting) (footnote omitted).

placing adoptive children in an alternative, but unproven, family structure that has not yet been conclusively demonstrated to be equivalent to the marital family structure that has established a proven track record spanning centuries. Accordingly, we conclude that appellants' proffered social science evidence does not disprove the rational basis of the Florida statute.

### e. Romer v. Evans

Finally, we disagree with appellants' contention that Romer requires us to strike down the Florida statute. In Romer, the Supreme Court invalidated Amendment 2 to the Colorado state constitution, which prohibited all legislative, executive, or judicial action designed to protect homosexual persons from discrimination. 517 U.S. 620, 624, 116 S. Ct. 1620, 1623 (1996). The constitutional defect in Amendment 2 was the disjunction between the "[s]weeping and comprehensive" classification it imposed on homosexuals and the state's asserted bases for the classification—respect for freedom of association and conservation of resources to fight race and gender discrimination. Id. at 627, 116 S. Ct. at 1625. The Court concluded that the Amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." Id. at 632, 116 S. Ct. at 1627.

Unlike Colorado's Amendment 2, Florida's statute is not so "[s]weeping and comprehensive" as to render Florida's rationales for the statute "inexplicable by anything but animus" toward its homosexual residents. Amendment 2 deprived homosexual persons of "protections against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." Id. at 631, 116 S. Ct. at 1627. In contrast to this "broad and undifferentiated disability," the Florida classification is limited to the narrow and discrete context of access to the statutory privilege of adoption[27] and, more importantly, has a plausible connection with the state's asserted interest. Id. at 632, 116 S. Ct. at 1627. Moreover, not only is the effect of Florida's classification dramatically smaller, but the classification itself is narrower. Whereas Amendment 2's classification encompassed both conduct *and* status, id. at 624, 116 S. Ct. at 1623 (quoting the text of Amendment 2, which covered "homosexual, lesbian or bisexual orientation, conduct, practices or relationships"), Florida's adoption prohibition is limited to conduct, see Cox, 627 So. 2d at 1215. Thus, we

---

[27] See also Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289, 299 (6th Cir. 1997):

> [T]he Romer majority's rejection of rational relationship assessment hinged upon the wide breadth of Colorado Amendment 2, which deprived a politically unpopular minority of the opportunity to secure special rights at every level of state law. The uniqueness of Colorado Amendment 2's sweeping scope and effect differentiated it from the "ordinary case" in which a law adversely affects a discernable group in a relatively discrete manner and limited degree.

conclude that <u>Romer</u>'s unique factual situation and narrow holding are inapposite to this case.

## III. CONCLUSION

We exercise great caution when asked to take sides in an ongoing public policy debate, such as the current one over the compatibility of homosexual conduct with the duties of adoptive parenthood. <u>See</u> <u>Reno</u>, 507 U.S. at 315, 113 S. Ct. at 1454; <u>Schall v. Martin</u>, 467 U.S. 253, 281, 104 S. Ct. 2403, 2419 (1984). The State of Florida has made the determination that it is not in the best interests of its displaced children to be adopted by individuals who "engage in current, voluntary homosexual activity," <u>Cox</u>, 627 So. 2d at 1215, and we have found nothing in the Constitution that forbids this policy judgment. Thus, any argument that the Florida legislature was misguided in its decision is one of legislative policy, not constitutional law. The legislature is the proper forum for this debate, and we do not sit as a superlegislature "to award by judicial decree what was not achievable by political consensus." <u>Thomasson v. Perry</u>, 80 F.3d 915, 923 (4th Cir. 1996). The judgment of the district court is **AFFIRMED.**

47