Dr. Lenora B. FULANI, individually and as the candidate for President of the United States on the slate of candidates from the New Alliance Party of Florida, and the New Alliance Party of Florida, Plaintiffs–Appellants,

v.

Robin KRIVANEK, Supervisor of Elections, Hillsborough County, Florida, individually and on behalf of all other Supervisors of Elections in the State of Florida, Defendant–Appellee,

State of Florida, Intervenor–Defendant.

No. 91–3918.

United States Court of Appeals,
Eleventh Circuit.

Oct. 5, 1992.

James K. Green, West Palm Beach, Fla., Terry E. Allbriton, New Orleans, La., for plaintiffs-appellants.

John J. Dingfelder, Asst. County Atty., Hillsborough County Attorney's Office, Tampa, Fla., George Lee Waas, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendant-appellee.

Before KRAVITCH, Circuit Judge, CLARK, Senior Circuit Judge, and PITTMAN*, Senior District Judge.

KRAVITCH, Circuit Judge:

In this ballot-access case, plaintiffs New Alliance Party ("NAP") and Lenora B. Fulani ("Fulani") appeal from the district court's ruling in favor of defendants State of Florida and Hillsborough County Supervisor of Elections Robin Krivanek ("Krivanek"). The district court held that Fla. Stat. § 99.097(4), which excludes minor political parties from a provision allowing candidates qualifying by petition to waive unduly burdensome signature-verification fees, does not violate the Equal Protection Clause or the First Amendment. We reverse.

---

* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

## BACKGROUND

Fulani was the NAP's candidate for President of the United States in the 1988 election. The NAP, which in 1988 was listed on the general-election ballots of all fifty states and the District of Columbia, is classified as a "minor political party" under Florida election law.[1] Presidential candidates of the two major political parties are placed on the general-election ballot by the governor. *See* Fla.Stat. § 103.021(1) & (2). To gain access to the ballot, minor-party and independent candidates for President must submit petitions containing the signatures of at least one percent of the registered voters in the state. *See* Fla.Stat. § 103.021(3). It is well settled that such a difference in treatment does not violate the Constitution. *See, e.g., American Party of Texas v. White,* 415 U.S. 767, 793–94, 94 S.Ct. 1296, 1312, 39 L.Ed.2d 744 (1974).

Section 103.021(3) also provides that a minor-party or independent candidate must submit a separate petition to the supervisor of elections for each county from which signatures are solicited. The supervisors then check the signatures to certify their validity. Pursuant to section 99.097(4), the candidate must pay the supervisors "the sum of 10 cents for each signature checked or the actual cost of checking such signature, whichever is less."[2] We have endorsed the constitutionality of conditioning access to the ballot on payment of this signature-verification fee, stating that "Florida's procedures are not impermissibly burdensome as to cost." *See Libertarian Party of Florida v. Florida,* 710 F.2d 790, 794 (11th Cir.1983), *cert. denied,* 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984). In 1988, there were 5,631,200 registered voters in Florida. To gain access to the ballot, the NAP needed to collect at least 56,312 signatures, which cost $5,631.20 to have verified.

Alternatively, by collecting signatures of at least 1.15 percent of the registered voters (rather than the minimum one percent), a candidate is entitled to have the supervisors check the signatures by random sample. *See* Fla.Stat. § 99.097(1)(b). Because the verification fee remains ten cents per signature actually checked, this method of verification can be considerably less expensive for the candidate.[3]

The provision challenged by appellants states that:

> if a candidate, person, or organization seeking to have an issue placed upon the ballot cannot pay such charges without imposing an undue burden on personal resources or upon the resources otherwise available to such candidate, person, or organization, such candidate, person, or organization, shall, upon written certification of such inability given under oath to the supervisor, be entitled to have the signatures verified at no charge. *However, an oath in lieu of payment of the charges shall not be allowed to verify the signatures on a petition to obtain ballot position for a minor party.*

Section 99.097(4) (emphasis added).[4]

Fulani submitted the requisite number of signatures to the county supervisors of elections. She attempted to have the verification fee waived by submitting to defendant Krivanek an "affidavit of undue burden." The defendant rejected Fulani's affidavit. According to appellants, faced with the choice of "either diminish[ing] the financial resources of her campaign[ ] or not pay[ing] to have the signatures verified

---

1. A "minor political party" is defined as "any group ... which ... does not have registered as members 5 percent of · the total registered electors of the state." Fla.Stat. § 97.021(14).

2. Section 99.097, titled "Verification of signatures on petitions," applies also to petitions submitted by independent and minor-party candidates for state office, *see* Fla.Stat. §§ 99.0955 & 99.096, and petitions submitted by organizations seeking to place initiatives on the ballot. *See* Fla.Stat. § 100.371.

3. As Fulani points out, however, this saving is diluted by the practical expenses associated with collecting the additional signatures.

4. In a code section similar to section 99.097(4), candidates in major-party primaries who cannot afford the primary filing fees are allowed to qualify for the primary ballot by submitting petitions, which are verified at no charge. *See* Fla.Stat. § 99.0955.

(thereby preventing her name from being placed on the general election ballot)," Fulani paid the verification fee of $5,631.20. The parties agreed that this case is not moot because of Fulani's plans to run for President in the future.

Fulani filed an action in the district court challenging the constitutionality of the statute and seeking injunctive relief, and the state intervened as a defendant. The district court denied relief, ruling that the statute did not violate the Equal Protection Clause or the First Amendment. Fulani filed a timely notice of appeal.

## DISCUSSION

■ Review is plenary. *See East–Bibb Twiggs Neighborhood Assoc. v. Macon Bibb Planning & Zoning Comm'n,* 896 F.2d 1264, 1265 (11th Cir.1989). Appellants argue that the provision of section 99.097(4) denying minor-party candidates the fee-waiver option violates the Equal Protection Clause because it is a discriminatory classification that unfairly burdens their fundamental First and Fourteenth Amendment right to associate politically by conditioning ballot access on paying a fee that unduly burdens their resources. Appellants do not contest the validity of the verification fee, but instead argue that the state may not discriminate as to which group may avoid paying the fee, at least when the state has failed to advance a sufficiently important interest that is furthered by this discriminatory classification.

Appellees contend that our decision in *Libertarian Party,* in which we upheld the constitutionality of a different portion of section 99.097(4), controls the disposition of this case. They further assert that expressly discriminating against minor-party candidates in the fee-waiver provision advances the important interests of, *inter alia,* regulating elections, and preventing voter confusion by limiting ballot access to political parties with a significant modicum of support.

Because the state has failed to explain how its asserted interests justify the discriminatory classification contained in section 99.097(4), we hold that the fee-waiver

provision violates appellants' rights to equal protection in the exercise of their First and Fourteenth Amendment rights.

## I. Distinguishing *Libertarian Party*

We note preliminarily that *Libertarian Party,* in which this court upheld three provisions of Florida's election law against equal protection and First Amendment challenges, does not control. In that case, the Libertarian Party first argued that Fla. Stat. § 99.096(1), which required that minor-party candidates for statewide office submit signatures of three percent of the state's registered voters to gain access to the general election ballot, impermissibly burdened their rights. We held that the three-percent requirement (1) advanced the state's "important interest 'in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.'" *Id.* at 793 (quoting *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)); and (2) was the "least drastic means" to protect this interest. *Id.* at 793. Appellants here do not challenge the one-percent-signature requirement for access to the Presidential ballot.

Second, the Libertarian Party challenged the provision of Fla.Stat. § 99.096(1) that "a minor political party may not run a candidate in a local election without first obtaining access to the state's general election ballot through the 3% statewide petitioning requirement," while an independent candidate could run in a local election without circulating a statewide petition. *Id.* at 795. We held that, in such a situation, the disparity in treatment was justified because the requirement of statewide support for minor-party candidates achieved the goal of assuring the voters and the state that "particular party designation has some meaning in terms of a 'statewide, ongoing organization with distinctive political character.'" *Id.* (quoting *Storer v. Brown,* 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39

L.Ed.2d 714 (1974)), while the state's interest in ensuring that an independent is "truly independent," *id.* (quoting *Storer*, 415 U.S. at 745, 94 S.Ct. at 1286) would not be advanced by a statewide-petition requirement.

Finally, we rejected the Libertarian Party's challenge to section 99.097's signature-collection requirement, holding (1) that "Florida's procedures are not impermissibly burdensome as to cost" and (2) "[t]hat minor parties must incur some expenses in accumulating the necessary signatures to qualify for the ballot does not constitute an equal protection violation."

We did not, however, address in *Libertarian Party* the constitutionality of the fee-waiver provision because the Libertarian Party did not challenge it.[5] Thus, we could not have decided the issue. We did mention the fee-waiver provision, but only as part of a description of the code section:

> Florida's procedures are not impermissibly burdensome as to cost. Florida provides petitions free of charge. Fla. Stat.Ann. § 99.096(2) (West 1982). County election supervisors charge 10 cents per signature to cover the costs of verifying the petitions, but they may use random sampling techniques which reduce the number of signatures checked and therefore the cost. Fla.Stat.Ann. § 99.-097(1)(b) (West 1982). *Although filing fees may be waived, there is no provision for waiver of the 10–cent charge for minority parties. Id. at § 99.097(4).* Plaintiffs have cited no cases holding that states must provide free access to the ballot in all circumstances.

*Id.* at 794 (emphasis added).

In *Clean–Up '84 v. Heinrich*, 590 F.Supp. 928, 932–33 (M.D.Fla.1984), *aff'd on other grounds*, 759 F.2d 1511 (11th Cir.1985),[6] the District Court for the Middle District of Florida invalidated the same fee-waiver provision of section 99.097(4) that we now consider, as it then applied to organizations proposing ballot initiatives, finding that the provision violated the Equal Protection Clause.[7] In *Clean–Up '84*, as in the instant case, the state asserted that *Libertarian Party* was dispositive. The district court rejected that argument, noting that the *Libertarian Party* court had not addressed the fee-waiver provision. *Id.* at 933.

II. *The Proper Test for Considering Equal Protection Challenges to Ballot–Access Restrictions*

Appellants contend that section 99.097(4)'s classification prohibiting minor parties from waiving unduly burdensome signature-verification fees infringes their fundamental First and Fourteenth Amendment rights. "Restrictions on access to the ballot burden [the] fundamental ... 'right of individuals to associate for the advancement of political beliefs'...." *Illinois St. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). Ordinarily, "the strict scrutiny test is applicable under the Equal Protection Clause to classifications affecting the exercise of fundamental rights." *American Booksellers v. Webb*, 919 F.2d 1493, 1499 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2237, 114 L.Ed.2d 479 (1991). *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1287–88, 36 L.Ed.2d 16 (1973). Under strict-scrutiny analysis, once a plaintiff has demonstrated the burden on her fundamen-

---

5. In fact, the Libertarian Party mistakenly believed that minor-party candidates *were* allowed to waive the filing fee: "Although the Florida Election code allows a waiver of the failing [sic] fee for a minor party or an independent party [sic] candidate if someone cannot afford to pay the filing fee, the candidate must nevertheless expend the [sic] huge sums in order to meet the petition requirements." Brief for Appellant at 31–32, *Libertarian Party of Florida v. Florida*, 710 F.2d 790 (11th Cir.1983) (No. 82–5617).

6. The court of appeals expressly noted that Florida had failed to appeal the district court's decision discussed herein. *See Clean–Up '84*, 759 F.2d at 1512 n. 3.

7. In 1990, the legislature amended the section to include ballot-initiative organizations in the fee-waiver provision, leaving only minor-party candidates excluded.

tal right, the state must show "that the law advances a compelling interest and is narrowly tailored to meet that interest." *Duke v. Cleland,* 954 F.2d 1526, 1529 (11th Cir.1992). *See Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 221, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989).

That this is a ballot-access case affects the analysis we choose, however. The Supreme Court has held that when addressing a First Amendment challenge to a state election law, rather than applying strict scrutiny:

> a court ... must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). *See Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 213–14, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986). The approach used by the *Anderson* Court can be described as a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances. In *Burdick v. Takushi,* — U.S. —, —, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992), the Supreme Court reiterated the *Anderson* test and reaffirmed that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently."

It is not entirely clear, however, whether the Supreme Court would apply this test in an equal protection situation. None of the Supreme Court cases employing the *Anderson* test concerned an equal protection challenge to state election laws. *Bur-*

*dick, Tashjian,* and *Anderson* each involved challenges based solely on the First Amendment. The *Anderson* Court noted that "[w]e base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis." *Anderson,* 460 U.S. at 787 n. 7, 103 S.Ct. at 1568–69 n. 7. The Court added that:

> [w]e rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment. These cases, applying the "fundamental rights" strand of equal protection analysis, have identified the First and Fourteenth Amendment rights implicated by restrictions on the eligibility of voters and candidates, and have considered the degree to which the state's restrictions further legitimate state interests. *See, e.g., Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Illinois [St. Bd. of] Elections v. Socialist Workers Party,* [440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)].

*Id.* See also *Norman v. Reed,* — U.S. —, —, —, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992) (employing *Anderson* approach while basing holding solely on First Amendment grounds). That the *Anderson* Court cited with approval equal protection cases applying strict scrutiny analysis arguably indicates that the Court might still use such a standard when considering an equal protection challenge to a state election law.

In this circuit, however, equal protection challenges to state ballot-access laws are considered under the *Anderson* test. *See Bergland v. Harris,* 767 F.2d 1551, 1552 (11th Cir.1985). *Compare Manifold v. Blunt,* 863 F.2d 1368, 1373 & n. 9 (8th Cir.1988), *cert. denied,* 493 U.S. 893, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989) (applying strict scrutiny and rejecting *Anderson* test); *Dixon v. Maryland St. Admin. Bd. of Election Laws,* 878 F.2d 776, 778–80 (4th Cir.1989) (noting possible distinction between challenges based on the Equal Pro-

tection Clause and challenges based on the First Amendment); *Libertarian Party of Indiana v. Marion County Bd. of Voter Registration,* 778 F.Supp. 1458, 1462–63 (S.D.Ind.1991) (noting same possible distinction).

### III. *Analysis Under the Anderson Test*

Even under the less rigorous *Anderson* test, we conclude that the fee-waiver provision of section 99.097(4) violates appellants' right to equal protection. Once a plaintiff has identified the interference with the exercise of her First Amendment rights, the burden is on the state to "put forward" the "precise interests ... [that are] justifications for the burden imposed by its rule." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. *Cf. Geary v. Renne,* 911 F.2d 280, 283 (9th Cir.1990) (describing burden of coming forward under strict-scrutiny analysis). Here, the state has failed to assert an interest to which the discriminatory classification contained in the fee-waiver provision is necessary, or even especially relevant. The state identifies interests that courts have found compelling in other cases, but fails to explain the relationship between these interests and the classification in question. Although there could be an important interest, unarticulated by the state, that is advanced by excluding minor-party candidates from the benefits of the fee-waiver provision, it is beyond our competence to search for one *sua sponte.*

#### A. Character and Magnitude of the Asserted Injury

We "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. Section 99.097(4) explicitly discriminates against minor-party candidates: "[A]n oath in lieu of payment of

the charges shall not be allowed to verify the signatures on a petition to obtain ballot position for a minor party." Appellants' asserted injury is that their right to equal protection was violated because they were forced to shoulder an undue burden on their finances in order to gain a place on the ballot, thus unfairly burdening their First and Fourteenth Amendment right to associate politically.[8]

The injury suffered by appellants was not so severe as to "operate to freeze the status quo" by completely preventing minor-party access to the ballot. *See Jenness,* 403 U.S. at 438, 91 S.Ct. at 1974. Fulani was able to qualify by paying the $5,631.20 fee. Appellants, however, were forced to bear an unequal burden in order to gain access to the ballot. Fulani was required to pay the signature-verification fee after asserting that it would impose an undue burden by diverting funds from her party's attempt to identify, reach, and communicate with potential supporters. The Supreme Court has stated that targeting minor-party candidates in particular can be a significant infringement on First Amendment rights.

> A burden that falls *unequally* on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It *discriminates* against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties.

*Anderson,* 460 U.S. at 793–94, 103 S.Ct. at 1572 (emphasis added).[9]

The *Anderson* Court added that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, *associational preference,* or economic sta-

---

8. The Supreme Court has also recognized "the constitutional right of citizens to create and *develop* new political parties. The right derives from the First and Fourteenth Amendments and advances the constitutional interest of likeminded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political prefer-

ences." *Norman,* —— U.S. at ——, 112 S.Ct. at 705 (footnote omitted and emphasis added).

9. The Court has also noted that "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Bullock,* 405 U.S. at 144, 92 S.Ct. at 856.

tus." 460 U.S. at 793, 103 S.Ct. at 1572 (emphasis added). Further, "because the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial scrutiny." *Id.* at 793 n. 16, 103 S.Ct. at 1573 n. 16.

The Court, which expressly drew on equal protection reasoning in reaching its decision, 460 U.S. at 787 n. 7, 103 S.Ct. at 1568 n. 7, struck down Ohio's early filing deadline for independent candidates even though the deadline was not an absolute bar to ballot access, stating that it:

> *burdens* the signature-gathering efforts of independents who decide to run in time to meet the deadline. When the primary campaigns are far in the future and the election itself is even more remote, the *obstacles* facing an independent candidate's organizing efforts are *compounded.* Volunteers are *more difficult* to recruit and retain, media publicity and campaign contributions are *more difficult* to secure, and voters are *less interested in the campaign.*

460 U.S. at 792, 103 S.Ct. at 1572 (emphasis added). According to the Court, "Our ballot access cases ... focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction *unfairly* or *unnecessarily* burdens the 'availability of political opportunity.'" *Id.* (quoting *Clements v. Fashing,* 457 U.S. 957, 964, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982) (plurality opinion) (quoting *Lubin,* 415 U.S. at 716, 94 S.Ct. at 1320)).

The burdens cited by the Court in invalidating the statute are of the same character as those shouldered by appellants in the instant case, when forced to part with funds that are needed for an effective campaign. Similarly, in *New Alliance Party of Alabama v. Hand,* 933 F.2d 1568 (11th Cir.1991), this court invalidated Alabama's early deadline for independent and minor-party candidates, holding that:

although Alabama's early deadline does not serve to "freeze the status quo," *see Jenness v. Fortson, supra,* it does make it *moderately difficult* for a minor party candidate to qualify to be on the ballot....

Although the court finds that the burden imposed on minor parties *is not insurmountable,* the Court determines that plaintiffs are due to be granted the relief requested because the interests put forth by the defendant do not adequately justify the restriction imposed.

*Id.* at 1575–76 (Emphasis added). *See also Libertarian Party of Indiana,* 778 F.Supp. at 1463 (invalidating Illinois election law restricting minor-party access to voter registration lists because "[a]lthough the plaintiffs have access to the Registration List, their undisputed contention is that they would have to *expend significant amounts of labor and money* to have the list in a usable form, *a burden not imposed on the major political parties"*) (emphasis added).

The state argues that because section 99.097(4) provides the less expensive option of signature verification by random sample upon submission of the signatures of an additional .15 percent of the registered voters, the burden on appellants is only slight. We note, however, that the cost of random-sample verification, combined with the practical cost of obtaining the additional signatures, still amounts to a significant percentage of the fee that otherwise would be charged. Moreover, we note that the legislature's decision to exempt other financially burdened candidates or organizations from paying even for random-sample verification indicates that the legislature recognized this fact. The state also quotes this court's *Libertarian Party* opinion for the proposition that "no cases ... hold that states must provide free access to the ballot in all circumstances." 710 F.2d at 794. We note again that appellants do not seek free access in all circumstances—they seek instead equal treatment in the application of the fee-waiver provision.

### B. *The Precise Interests Put Forward by the State*

Our second step is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," determining "the legitimacy and strength of each of those interests." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. The state asserts interests that are indisputably important: regulating the election process, *Libertarian Party*, 710 F.2d at 792, avoiding voter confusion by ensuring that a party has a significant modicum of support before its name appears on the ballot, *Lubin*, 415 U.S. at 715, 94 S.Ct. at 319, and ensuring that a party has a "statewide, ongoing political organization with distinctive political character." *Libertarian Party*, 710 F.2d at 795.

The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification here at issue. As the district court in *Clean–Up '84* stated, "The Court is troubled by the State's complete failure to justify the distinction 99.097(4) draws...." 590 F.Supp. at 933.

The state echoes the district court's reasoning that producing the required number of petition signatures ensures that a minor party has the support necessary to avoid voter confusion, and that "[t]he fee is incidental to that requirement and necessary to assure that the signatures are genuine and valid." *Fulani v. Krivanek*, No. 88–671–Civ–T–10(B) (M.D.Fla., filed Aug. 22, 1991). This, however, is merely a justification for the fee, not for the unequal availability of the fee-waiver. Even if the fee were merely incidental to the petition requirement, distinguishing between which groups may avoid paying the fee is a separate ballot regulation that must be justified on its own.

The state cites to a passage in *Libertarian Party* in which we stated that "the qualitative difference between an independent candidacy and a party candidacy justifies differences in treatment." *Libertarian Party*, 710 F.2d at 795. Likewise, in *New Alliance Party of Alabama*, 933 F.2d at 1575, we stated that "it has been a constant theme in the cases governing ballot access restrictions that a State need not, and indeed probably should not, treat minor parties and independents the same as major parties."

These cases merely hold that equal protection does not require that minor-party, major-party, and independent candidates be treated exactly the same. They do not hold that these candidates may be treated differently *without justification* when the difference in treatment unequally burdens one group. *See American Party*, 415 U.S. at 781, 94 S.Ct. at 1306. In *MacBride v. Askew*, 541 F.2d 465, 468 (5th Cir.1976), for instance, the former Fifth Circuit affirmed the propriety of treating minor parties and independents differently in the context of a Florida law that prohibited party candidates from running as independents. In that situation, the difference in treatment was *justified* by the state's interest in avoiding voter confusion by ensuring that independents were truly independent and party candidates in fact had party support.

Further, appellants point out that the importance of the interests asserted by the state is lessened when, as here, the state regulates the ballot of a *national* election:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest.... [I]n a Presidential election a State's enforcement of more stringent ballot access requirements ... has an impact beyond its own borders. Similarly, *the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.*

*Anderson*, 460 U.S. at 794–95, 103 S.Ct. at 1573. *See Bergland*, 767 F.2d at 1554–55. In particular, the state's interest in assuring that a party has a statewide, ongoing political organization with distinctive political character is significantly diminished.

### C. *Necessity of the Provision to Advancing the State's Interests*

Finally, we "must consider the extent to which th[e state's] interests make it neces-

sary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. We are not persuaded that the unequal availability of the fee-waiver provision is at all necessary to advance the boilerplate interests put forward by the state.

Our discussion on this point narrows to focus on the extent to which the fee-waiver provision is necessary to advance the interest of avoiding voter confusion by ensuring that a party has a significant modicum of support, the asserted interest that comes closest to being even rationally related to the burden placed on Fulani as a minor-party candidate for President.

At oral argument, when pressed by this court to put forward a precise interest advanced by the discriminatory classification contained in section 99.097(4), the state finally asserted that ensuring that a party has a modicum of support "is demonstrated in two ... ways, first, the signatures, and second, paying for having the supervisors of elections verify those signatures." The state continued that "independent candidates are not making an expression of a base of a party's support, and when you make a representation as [to the base of] party support, you are representing to the public that you have a foundation of supporters out there."

We note first that discriminating as to which financially burdened candidates may waive the verification fee is not necessary to demonstrating a modicum of support. The interest in avoiding voter confusion is adequately furthered by section 103.021(3)'s requirement that minor-party candidates submit signatures of one percent of the registered voters. *See Libertarian Party*, 710 F.2d at 794 (three-percent-signature requirement for statewide office). Second, it is constitutionally imper-

missible for a state to measure a party's level of support by the state of its finances. *See Clements*, 457 U.S. at 964, 102 S.Ct. at 2844. A state might permissibly charge a nondiscriminatory fee that advances the regulatory interest of reimbursing the state for its election expenses, particularly if it offers alternative avenues of ballot access, but it cannot use the fee to decide who deserves to be on the ballot. Third, even if it were permissible to measure support in such a way, a party's ability to pay a verification fee is not rationally related to whether that party has a modicum of support. "Economic status is not a measure of a prospective candidate's qualifications to hold elective office, and a filing fee alone is an inadequate test of whether a candidacy is serious or spurious." *Id.*[10] As the district court explained in *Clean–Up '84*, which invalidated the fee-waiver provision as it then applied to deny the fee-waiver option to organizations proposing ballot initiatives:

> Although the Court recognizes the strong and legitimate interest of the State in regulating the election process, the State has demonstrated *no necessity* for prohibiting the waiver of the ten cent charge when petitioners seek to place an issue on the ballot but allowing the same waiver in the case of a candidate for office.

*Clean–Up '84*, 590 F.Supp. at 932 (emphasis added).

We hold, therefore, that under the analysis set forth in *Anderson*, section 99.097(4) violates appellants' right to equal protection in the exercise of their First and Fourteenth Amendment rights. Appellants have identified a significant burden on their rights, while the state has failed to justify the discriminatory classification that appellants have challenged.[11]

---

**10.** A political party devoted to advancing the interests of homeless citizens might have a large number of adherents but an inability to pay a $5,000 verification fee. Conversely, a party with highly idiosyncratic views might be able to spend $5,000 to gain access on the ballot, but unable to gather 50,000 signatures.

**11.** We mention briefly that even had the state asserted an interest in protecting the rights of indigent *individuals*, as opposed to *parties*, such an interest would not be rationally related to this statute, which allows ballot-initiative *organizations* to have the fee waived, and allows individuals to waive the fee after asserting an undue burden on resources other than personal resources.

## CONCLUSION

For the foregoing reasons, we RE-VERSE the district court's judgment and REMAND with instructions to enjoin defendants from enforcing the provision of section 99.097(4) prohibiting minor-party candidates from taking advantage of the fee-waiver provision upon written certification that paying such fees would impose an undue burden.