[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13356

_____

LIBERTARIAN PARTY OF ALABAMA,

Plaintiff-Appellant,

*versus*

JOHN HAROLD MERRILL,
Secretary of State for the State of Alabama,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:19-cv-00069-ECM-JTA

_____

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

LUCK, Circuit Judge:

Alabama maintains a list containing the name and registration information of every registered voter in the state. Each political party with ballot access gets a copy of the voter list for free. But political parties without ballot access have to pay for it. The issue before us is whether this distinction—between political parties with ballot access and those without it—unconstitutionally burdens the Libertarian Party of Alabama's First and Fourteenth Amendment rights.

We hold that it does not. The Libertarian Party has not met its burden to demonstrate that the distinction drawn by Alabama's voter list law is discriminatory or severely burdens the Party's constitutional rights. Rather, it's rationally related to and furthers important state interests in supporting political parties with a modicum of popular support and alleviating administrative burdens. Thus, after careful review and with the benefit of oral argument, we affirm the district court's summary judgment for John Harold Merrill, the Alabama Secretary of State.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### The Alabama Voter List Law

Under Alabama law, a political party isn't entitled to a spot on the ballot just because it calls itself a political party. Instead, a political party must satisfy the state's ballot access requirements.

There are two ways that a political party can earn a place on the ballot: petition and performance.

Under the first way, a party receives ballot access if it submits a petition with "a list of the signatures of at least three percent of the qualified electors who cast ballots for the office of Governor in the last general election for the state, county, city, district, or other political subdivision in which the political party seeks to qualify candidates for office." Ala. Code § 17-6-22(a)(1). There are slightly over three-and-a-half million registered voters in Alabama, and turnout in the 2018 gubernatorial election was about fifty percent. Thus, a successful petition for statewide ballot access in 2020 required signatures from 51,588 registered voters.

Under the second way—performance—a political party qualifies for statewide ballot access if it received at least twenty percent of the vote cast for an officer in the most recent statewide election. *Id.* § 17-13-40. The Republican and Democratic parties, for example, both consistently maintain ballot access by getting at least twenty percent of the statewide vote each election.

Now for the state's voter list. Alabama keeps a "computerized statewide voter registration list" containing "the name and registration information of every legally registered voter in the state." *Id.* § 17-4-33(a), (a)(9). This information includes "the name, address, . . . voting location," and "voting history of each registered voter." *Id.* § 17-4-33(a)(2), (4). The voter list is an important tool for effectively locating voters, petitioning for ballot access, and campaigning for elected office.

Several entities get the voter list free of charge. State legislators receive the voter list for free within 90 days of assuming office, which helps them provide services to their constituents. *Id.* § 17-4-38(e). The Alabama Administrative Office of Courts is entitled to the list for free, which it uses to produce the state's master jury list. *Id.* § 17-4-38(f). The chief elections officers from other states are also entitled to a free copy of the list, which helps the states identify voters who have left Alabama. *Id.* § 17-4-38(g). Alabama also sends the voter list to the Electronic Registration Information Center (a non-profit group) for free on a monthly basis. And, relevant to this appeal, each political party with ballot access gets an electronic copy of the voter list for free:

> Following each state and county election, the Secretary of State shall provide one electronic copy of the computerized voter list free of charge to each political party that satisfied the ballot access requirements for that election. The electronic copy of the computerized voter list shall be provided within 30 days of the certification of the election or upon the completion of the election vote history update following the election, whichever comes first. In addition, upon written request from the chair of a political party, the Secretary of State shall furnish up to two additional electronic copies of the computerized voter file during each calendar year to each political party that satisfied the ballot access requirements during the last statewide election held prior to that calendar year. The electronic copies provided pursuant to this

section shall contain the full, editable data as it exists in the computerized voter list maintained by the Secretary of State.

*Id.* § 17-4-33(a)(10).

Entities that don't fall within these categories—including political parties without ballot access—have to pay "for the production of" the voter list. *Id.* § 17-4-38(b). Because the secretary charges one penny per voter record, in 2020 it would have cost $35,912.76 to buy the records for every registered voter in the state. But purchasing the voter list isn't all or nothing; one can buy a "subset" of the list for just the voters in a specific county or district.

A person paying for the list out of pocket can request it from an online portal. Each request for a free copy of the list is processed by one of the six employees in the secretary's elections division. It takes about fifty minutes to compile and email the voter list because the file is "very large," and while the employee's computer is processing the file it generally can't be used to perform other tasks.

*The Libertarian Party of Alabama*

In the 2000 general election, one of the Libertarian Party of Alabama's candidates earned over twenty percent of the vote in a statewide race. As a result, the Party obtained statewide ballot access for the 2002 general election. But the Party failed to replicate this success in the 2002 general election and lost statewide ballot access. It has yet to regain statewide ballot access and its support

in elections rarely exceeds single digits. Since 2002, only twenty-eight candidates have run in Alabama under the Party's banner.

In 2012, the Party's then-chair estimated that the Party had between 250 and 300 members, "give or take a dozen." By 2020, the Party had only 134 official members. No one in the Party is formally responsible for candidate recruitment or achieving ballot access. Its candidates are selected at an annual convention—usually attended by about fifty party members—where there are never enough candidates in any given race to force a contested choice. The Party's fundraising is "extremely limited," even when compared to political parties in Alabama other than the Republican and Democratic parties. The Party currently has about $13,000 in its coffers, and its main expense is the annual convention.

Although the Party hasn't had statewide ballot access for two decades, it achieved ballot access in four local races in 2018 and, with it, free access to the subset of the voter list in those districts and counties.

*The Party Sues for Free Voter List Access*

In January 2019, the Party sued the secretary in the Middle District of Alabama, bringing First and Fourteenth Amendment claims under 42 U.S.C. section 1983. The Party alleged that sections 17-4-33 and 17-4-38 discriminated between major and minor political parties by giving a free copy of the voter list only to the major parties. (We will sometimes refer to sections 17-4-33 and 17-4-38, together, as the voter list law). This discrimination, the

Libertarian Party alleged, violated its right to associate and advance its political beliefs and therefore violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The Party sought declaratory relief and an injunction requiring the secretary to give it a free copy of the statewide voter list.

Following discovery, the secretary moved for summary judgment, which the district court granted. The district court applied the *Anderson-Burdick* balancing test, which governs challenges to ballot access laws. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). The district court concluded that sections 17-4-33(a)(10) and 17-4-38(b) didn't impose a severe burden on the Party because it could receive the voter list for free if it had ballot access, which the Party had previously achieved at the statewide level in 2000. Thus, strict scrutiny didn't apply, the district court explained, and Alabama had to show only that using ballot access as the criterion for a free copy of the voter list rationally served important state interests. The secretary had identified in discovery twenty important state interests that justified giving the voter list for free to political parties that had ballot access (by virtue of satisfying the three-percent petition requirement or the twenty-percent performance requirement). The district court grouped these interests into two categories: the state's interest in supporting parties with a modicum of popular support and the state's administrative interests.

As to the state's modicum-of-support interest, the district court said that even the Libertarian Party of Alabama agreed that

the state didn't have to give the voter list for free to every entity calling itself a political party.  A line had to be drawn somewhere, the district court reasoned, and drawing the line for a free copy of the voter list at having ballot access was the same as the line to get access to the ballot.  The district court explained that one of the important interests served by Alabama's ballot access laws was ensuring that only political parties with a modicum of support get a spot on the ballot.  This, in turn, minimized voter confusion and frustration of the democratic process.  The district court concluded that, similar to the important state interests furthered by the state's ballot access laws, the voter list law also furthered Alabama's important interests in supporting entities which perform important public functions, stabilizing the political system, and reducing fraud.

As to the state's administrative interests, the district court concluded that they too were rationally served by giving a free copy of the voter list to political parties with ballot access.  The district court said that the state had an administrative burden to determine which entities get free access to the voter list.  The state also had an administrative burden, the district court said, to provide the voter list for free to anyone that qualified for it, which was a time-consuming task that imposed significant "demands on elections staff."  The district court explained that relying on the state's ballot access rules to determine who gets the voter list for free provided a definite, objective, and constitutional standard, which spared election officials from having to spend a significant amount

of time figuring out which entities were and weren't entitled to a free copy of the voter list.

The district court concluded that, because Alabama's decision to provide the voter list for free to political parties with ballot access rationally served important state interests and didn't impose a severe and unconstitutional burden on the Libertarian Party, the *Anderson-Burdick* balancing test weighed in the state's favor and the voter list law didn't violate the First and Fourteenth Amendments. The Party now appeals from the district court's summary judgment.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree*, 992 F.3d at 1223.

## DISCUSSION

"In our Circuit, the balancing test of *Anderson* and *Burdick* controls challenges to ballot access requirements." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020) (citations and quotation marks omitted). "This test applies whether

a plaintiff challenges a ballot-access requirement under the First Amendment or the Equal Protection Clause of the Fourteenth Amendment." *Id.* But this isn't a ballot access case. The Libertarian Party hasn't challenged either of Alabama's two ways of achieving ballot access. It doesn't argue that the three-percent signature requirement in section 17-6-22(a)(1) is unconstitutional. And it doesn't argue that the twenty-percent performance requirement in section 17-13-40 is unconstitutional. The Party only challenges sections 17-4-33(a)(10) and 17-4-38(b), which give each political party with ballot access a free copy of the voter list but require a political party without ballot access to pay for it.

Whether the *Anderson-Burdick* test applies to a challenge to a voter list law is an issue of first impression for us. But we can resolve this appeal without resolving that question. This case has been litigated from the beginning under the assumption that the *Anderson-Burdick* test applies to the voter list law. Both the Party and the secretary argued to the district court, and to us on appeal, that the *Anderson-Burdick* test applies. The district court agreed and applied that test. We will do the same and assume that the *Anderson-Burdick* test applies to the Party's challenge to Alabama's voter list law. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that under the party presentation principle, "we rely on the parties to frame the issues for decision"). We now apply that test.

The Anderson-Burdick Test

Under the *Anderson-Burdick* test, "the level of scrutiny we apply to a ballot-access law depends on the severity of the burdens it imposes." *Indep. Party of Fla.*, 967 F.3d at 1281. Severe restrictions on ballot access must be narrowly tailored to advance a compelling state interest. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). "But reasonable, nondiscriminatory restrictions are usually justified by a state's important regulatory interests in conducting orderly elections." *Indep. Party of Fla.*, 967 F.3d at 1281 (cleaned up). "However severe the burden, we must ensure it is warranted by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* at 1281–82 (quotation marks omitted). We can only decide whether the challenged law is constitutional after "weigh[ing] all these factors." *Swanson v. Worley*, 490 F.3d 894, 903 (11th Cir. 2007).

Our analysis follows these three steps. We first examine the burdens imposed by sections 17-4-33(a)(10) and 17-4-38(b) on the Libertarian Party's constitutional rights. We then examine the state's regulatory interests advanced by these statutes. Finally, we weigh the burdens on the Libertarian Party's rights against the legitimate interests identified by the state.

The burden on the Libertarian Party's constitutional rights

We begin by "consider[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."

*Anderson*, 460 U.S. at 789.  The Libertarian Party maintains that Alabama's voter list law is discriminatory—"expressly" and in "practice"—and therefore subject to strict scrutiny because it "clearly discriminate[s] against minor parties . . . in favor of major parties by definition."  The Party also argues that denying it unfettered access to the voter registration list "severely burdens" its First and Fourteenth Amendment rights by impairing its ability to get ballot access signatures, educate voters, and campaign effectively.

The key statutory text refutes the claim that the voter list law expressly discriminates against minor political parties.  Section 17-4-33(a)(10) doesn't include the words "minor party," "major party," "Republican Party," or "Democratic Party."  Rather, it provides that the state will provide the voter list for free "to *each* political party that satisfied the ballot access requirements for that election," and "to *each* political party that satisfied the ballot access requirements during the last statewide election held prior to that calendar year."  Ala. Code § 17-4-33(a)(10) (emphases added).  Because "each" political party with ballot access is treated the same, section 17-4-33(a)(10) doesn't expressly discriminate against minor parties.  All political parties have an equal right to get a free copy of the list if they meet the standard provided by the voter list law— not just the Republican and Democratic parties.

The voter list law is also not discriminatory in practice.  True, the Republican and Democratic parties get ballot access every election, while the Libertarian Party of Alabama has lacked statewide ballot access since 2002.  But disparate outcomes aren't

necessarily the result of discrimination. "Discrimination," in a general sense "is the failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011) (quotation marks omitted); *see also Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 817–18 (11th Cir. 2004) ("Equal protection . . . does not forbid legislative classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." (citation and quotation marks omitted)). That the major parties consistently get ballot access—and therefore the voter list for free—is easily explained by the popular support the major parties receive from voters; the Libertarian Party of Alabama does not have the same degree of popular support. The voter list law isn't discriminatory in practice just because there are differences between the major and minor political parties. *Cf. Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike[.]").

In any event, in practice, minor political parties in Alabama, like the Republican and Democratic parties, have achieved ballot access in local races and at the statewide level. In 2018, four Libertarian Party candidates secured ballot access in local races and therefore received free access to the portion of the voter list corresponding to those races. Two other political parties—the Constitution Party and the Independence Party—achieved ballot access in local races in 2010 and 2014, satisfying the standard to get free

access to the voter list for those districts.  A third political party, the Freedom Party, got ballot access in two local races in 2006 but one of its candidates withdrew from the race.  And in 2002, the Libertarian Party enjoyed statewide ballot access because one of its candidates obtained over twenty percent of the vote in a statewide race in the 2000 general election.

We also conclude, for two reasons, that the voter list law doesn't severely burden the Party's constitutional rights.  First, in determining whether a ballot access law severely burdens a plaintiff's constitutional rights, the Supreme Court has asked whether the regulation "freeze[s] the political status quo." *Jenness*, 403 U.S. at 438.  We have said that a ballot access law does not "severely" burden a political party's constitutional rights where it "does not pose an insurmountable barrier" to the party getting on the ballot. *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 698–98 (11th Cir. 2014).  Alabama's voter list law does neither of these things: it does not freeze the political status quo, nor does it provide an insurmountable barrier to ballot access.

We know that the voter list law does not freeze the political status quo or pose an insurmountable barrier to ballot access because minor parties have successfully obtained ballot access.  As we have already explained, in 2018 four Libertarian Party candidates achieved ballot access in local races; three other minor political parties obtained ballot access in local races in 2006, 2010, and 2014; and the Libertarian Party had statewide ballot access during the 2002

general election.  The minor parties' success in gaining ballot access indicates that the barrier is not insurmountable.  *See id.* at 698.

Second, we have held that Alabama's ballot access petition law—requiring a candidate to get "signatures of at least three percent of qualified electors" who voted in the last gubernatorial election—is not a severe burden on the rights of independent or minor party candidates.  *Swanson*, 490 F.3d at 896.  Instead, we concluded that this ballot access law is "a reasonable, nondiscriminatory restriction."  *Id.* at 903.  If the state's nondiscriminatory restriction on ballot access doesn't severely burden the Party's rights, then a restriction one step removed from ballot access that also uses the same criterion is also reasonable and nondiscriminatory.

### The state's important regulatory interests

We next turn to the "important regulatory interests" proffered by the secretary to justify Alabama's voter list law.  *See Anderson*, 460 U.S. at 788.  The Libertarian Party argues that because the state's claimed regulatory interests—supporting only political parties with a "modicum of support" and "administrative interests"—are "baseless," the district court erred by crediting them. We disagree.

In examining the state's regulatory justifications, we must "determine the legitimacy and strength of the state's interests and consider the extent to which those interests make it necessary to burden the [plaintiff's] rights."  *Swanson*, 490 F.3d at 903 (cleaned up).  But where, like here, the burden on the plaintiff's rights isn't

severe, "the test is not whether the regulations are necessary"; it's whether "they rationally serve important state interests." *Id.* at 912.

As a threshold matter, the Party complains that the secretary "never explains the source" of the state interests justifying the decision to give a free copy of the voter list to political parties with ballot access. But we don't "require elaborate, empirical verification of the weightiness of the [s]tate's asserted justifications." *Timmons*, 520 U.S. at 364; *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) ("*Anderson* does not require any evidentiary showing or burden of proof to be satisfied by the state government."). Rather, the *Anderson-Burdick* test only asks a court to "identify and evaluate the interests put forward by the [s]tate as justifications for the burden imposed by its rule[.]" *Common Cause/Ga.*, 554 F.3d at 1352 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)). That is what the district court did based on the summary judgment record developed by the parties. That is what we will do too.

As to the state's interest in supporting political parties with a modicum of popular support, we have long recognized that this is an important state interest rationally served by ballot access laws. We previously considered a challenge to a Florida law requiring minor political parties seeking ballot access to submit a petition "signed by [three percent] of the state's registered voters." *Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 792 (11th Cir. 1983). The Libertarian Party of Florida "concede[d]" that "the state ha[d]

an interest in regulating the election process and avoiding voter confusion." *Id.* We agreed with this concession. "That these, and the other interests asserted, are compelling," we explained, "has been well established under decided cases." *Id.* (citing three Supreme Court cases). We said that "a state has an important interest 'in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.'" *Id.* at 793 (quoting *Jenness*, 403 U.S. at 442).

In *Swanson*, we concluded that Alabama's ballot access petition law rationally served the state's important interest "in requiring independent candidates to show they had a significant modicum of support before printing their names on the ballot." 490 F.3d at 911 (citation omitted). "[R]equiring candidates to demonstrate a modicum of support," we said, "discourages frivolous candidacies" and "ensur[es] that only bona fide independent candidates with a measure of support gain ballot access," preventing the ballot from being "clogg[ed]." *Id.* We also concluded that "reasonable ballot access regulations promote important state interests in preserving political stability by 'temper[ing] the destabilizing effects of party-splintering and excessive factionalism.'" *Id.* (quoting *Timmons*, 520 U.S. at 367). Thus, it is now "beyond dispute that Alabama has an important interest in requiring minor parties to

demonstrate some 'modicum of support' before they are entitled to a spot on the ballot." *Stein*, 774 F.3d at 700.

Just like we did in the ballot access law context, we conclude that Alabama's voter list law is rationally related to and furthers the state's important interest in supporting political parties with a modicum of popular support. The voter list law furthers this important interest by ensuring that only political parties with ballot access—in other words, a modicum of support—get the voter list for free. This, in turn, "discourages frivolous candidacies," ensures that "only bona fide" candidates "with a measure of support" get the list, and promotes the state's important interest in "preserving political stability" by tempering the destabilizing effects of party-splintering and excessive factionalism. *See Swanson*, 490 F.3d at 911. Because free access to the voter list depends on ballot access, it follows that the voter list law serves the same important regulatory interests served by the state's ballot access requirements.

The district court also identified two other important state interests subsumed within the modicum-of-support category of interests: Alabama's interest in "preventing access" to the voter list "by groups intent on fraud," and its interest "in supporting political entities which perform important public functions" like "nominating candidates, contesting elections, and putting forward a platform of proposed policies for consideration by voters." As to fraud-deterrence, a state has an important regulatory interest in "deterring" election fraud. *Crawford*, 553 U.S. at 191; *see also Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d

1299, 1327 (11th Cir. 2021) (explaining that "combatting voter fraud" was a valid neutral justification for a voter ID law). The voter list law serves this important interest because the standard used to determine who gets a copy of it for free—ballot access— helps ensure that the list will go to groups who will use it for legitimate political purposes.

As to the State's interest in supporting political entities that perform public functions, we conclude that a state has an important interest in supporting political parties that perform valuable public functions like assisting in the conduct of elections, partnering with the state in primaries, recruiting candidates for public office, registering voters, and encouraging public engagement. All of these functions help the state run efficient and reliable elections. And Alabama's voter list law furthers this important interest by rewarding political parties that perform these functions.

The Libertarian Party of Alabama maintains that we shouldn't import the "modicum of support" interest from the ballot access cases into this case because doing so amounts to "circular" reasoning. The voter list is "the most valuable tool to gain ballot access" and attain a modicum of popular support, the Party argues, and so the voter list law "makes it impossible" for minor parties to achieve statewide ballot access. But the results don't bear this out. The Party's success in the 2000 election, which earned it statewide ballot access in 2002, shows that it is not "impossible" for a minor party to get statewide ballot access without free access to the voter list. Likewise, the Party's success in local races in 2018 (as

well as the Freedom Party, Constitution Party, and Independence Party's successes in local races in 2006, 2010, and 2014) shows that it is not "impossible" to get ballot access without free access to the voter list.

The Party also argues that in *Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir. 1992), we "expressly condemned" tying an election-related fee "to the concept of a modicum of support." This too is wrong. *Fulani* involved the intersection of two Florida election laws. Florida's ballot access law required a minor-party candidate running for President to submit a petition signed by one percent of registered voters to get ballot access. *Id.* at 1540. The minor party was also required to have the supervisor of elections from each county where signatures were collected certify the signatures, at a cost of ten cents per signature. *Id.* Although the verification statute allowed a candidate to obtain a fee waiver by showing an undue financial burden, the statute forbade a "minor party" from getting the fee waiver. *Id.* We held that this "discriminatory classification" was a "significant burden" on the plaintiff that "the state has failed to justify." *Id.* at 1547. We rejected Florida's claim that it had an "interest of avoiding voter confusion by ensuring that a party has a significant modicum of support." *Id.* This was because "discriminating as to which financially burdened candidates may waive the verification fee is not necessary to demonstrating a modicum of support," which was already met when a minor-party candidate submitted a petition signed by one percent of registered voters. *Id.* We explained that "it is constitutionally impermissible for

a state to measure a party's level of support by the state of its finances." *Id.*

Fulani doesn't apply here for three reasons. First, that case involved a discriminatory statute that explicitly singled out minor political parties. But, as we explained above, Alabama's voter list law does not single out minor political parties. Second, we concluded in *Fulani* that Florida's certification law imposed "a significant burden" on the plaintiffs' First and Fourteenth Amendment rights. *Id.* Here, as we explained above, the voter list law doesn't significantly burden the Libertarian Party's rights. And third, the candidate in *Fulani* had secured "the requisite number of signatures" to obtain ballot access—one percent of registered voters— and therefore had already established a modicum of popular support but was still subject to the discriminatory fee. *Id.* at 1540. A state obviously can't use the "modicum of support" interest to justify a discriminatory regulation burdening a minor party that has already established a modicum of support. That's not the situation here. Conditioning free voter list access on showing popular support isn't analogous to refusing to waive a certification fee for a candidate that's already met the popular support requirements for ballot access.

As to the state's "administrative interests," we conclude that they too are important regulatory justifications rationally served by the voter list law in two ways. First, providing the voter list for free to each political party with ballot access gives the state an objective standard that is easy to apply. When a political party requests a

free copy of the voter list, the state has to confirm that the entity is eligible for a free copy. Linking eligibility to ballot access makes this a simple task. Under the voter list law, all the state has to do is check whether or not the political party has ballot access. This brightline standard is straightforward, leaves no room for guesswork, and relies on a criteria that we have already upheld as constitutional. *See Swanson*, 490 F.3d at 912 ("Alabama has articulated important interests justifying its reasonable, nondiscriminatory ballot access restrictions. Accordingly, we conclude that Alabama's election scheme, with a three-percent signature requirement and filing deadline on the primary election date, does not abridge plaintiffs' First and Fourteenth Amendment rights.").

Even the Party has conceded, before the district court and on appeal, that it's "not claiming [that] every requestor must get" the voter list "for free." If everyone doesn't get the list for free, where's the line? A line has to be drawn somewhere and any line will be "necessarily arbitrary." *See Libertarian Party*, 710 F.2d at 793. We cannot say that the clear-cut line the state has drawn—the line of ballot access which we upheld in *Swanson*—is an irrational one.

Second, limiting free access to the voter list only to political parties with ballot access rationally furthers the state's administrative interests because it eases the logistical burdens on the secretary's office. Giving the voter list for free only to political parties with ballot access cuts down on the number of requests the state gets for a free copy, which reduces how much time the state has to

spend on complying with those requests. The Party maintains that the state's interest in reducing administrative hardship is "dramatically undercut" because it already provides the voter list to other groups for free. The "only extra time required to provide" the list "free of charge," the Party claims, "would be the amount of time required to send" one more e-mail. But the summary judgment evidence says otherwise. The secretary explained that every single time the state gets a request for a free copy of the voter list, one of the six employees in the elections division of the secretary's office has to export the list from a program called PowerProfile; import the data into Microsoft Access; export the data from Access to a text file; and then email the list to the party requesting it. This process takes about fifty minutes and, because of the demands of processing this very large file, prevents the employee's computer from doing other tasks. That is the uncontested summary judgment evidence in this case. The voter list law rationally serves an important state administrative interest by reducing the burdens on the secretary that come with complying with a request for a free copy of the list.

### Weighing the *Anderson-Burdick* factors

The third and final step of the *Anderson-Burdick* balancing test requires us to "weigh" the above "factors"—the character and magnitude of the asserted injury to the Libertarian Party's constitutional rights weighed against the state's regulatory justifications—"to determine if the statute is constitutional." *Swanson*, 490 F.3d at 902–03. When a state ballot access law imposes only

"reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, a state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (cleaned up); *Swanson*, 490 F.3d at 903. That is the case here. As we explained above, Alabama's voter list law doesn't severely burden the Party's rights, and the secretary has offered important, nondiscriminatory reasons justifying the line the state has drawn—complying with the ballot access requirements—for a free copy of the voter list. Thus, "Alabama has articulated important interests justifying its reasonable, nondiscriminatory [voter list] access restrictions," and the voter list law "does not abridge [the Party's] First and Fourteenth Amendment rights." *See Swanson*, 490 F.3d at 912.

The Party argues that the district court erred by failing to consider, "in combination," "all of Alabama's onerous ballot access burdens on minor parties." In other words, the Party maintains that the district court should have examined the "cumulative burdens" imposed on it by the state's voter list law and the ballot access laws. This argument fails for two reasons.

First, in its opposition to summary judgment, the Party didn't argue that the district court should conduct a cumulative analysis. The Party likewise didn't argue that, even if sections 17-4-33(a)(10) and 17-4-38(b) were constitutional in a vacuum, their combined effect with Alabama's ballot access laws rendered them a severe burden on the Party's First and Fourteenth Amendments rights. Because the Party failed to present this argument to the

district court, it can't raise it now for the first time. *See, e.g., Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (refusing to consider issue "raised for the first time" on appeal).

Second, unlike the plaintiffs in *Swanson* who challenged two election regulations (the three-percent signature requirement *and* the filing deadline for ballot access), here the Party challenged only a single election regulation in its complaint: Alabama's voter list law. Having attacked only a single statutory scheme, the Party cannot argue now that the cumulative effect of other, unchallenged ballot access regulations renders the voter list law constitutionally infirm.

Ultimately, the test we apply here—the test the parties have asked us to apply—"is one of 'reasonableness, i.e., whether the statute unreasonably encroaches on ballot access.'" *Swanson*, 490 F.3d at 904 (quoting *Libertarian Party*, 710 F.2d at 793). Alabama has passed the test. Because the *Anderson-Burdick* weighing comes out in the state's favor, the voter list law does not violate the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.

Socialist Workers Party *Does Not Control*

Finally, the Party argues that the Supreme Court's summary affirmance in *Rockefeller v. Socialist Workers Party*, 400 U.S. 806 (1970) is "dispositive" and "binding" precedent that resolves this case. Not so. *Socialist Workers Party* involved different facts and a different state's voter list law. Because that case didn't involve

the precise issue that we address here—whether a voter list law like Alabama's violates the First and Fourteenth Amendments under the *Anderson-Burdick* balancing test—the Supreme Court's summary affirmance isn't dispositive or binding.

In *Socialist Workers Party v. Rockefeller*, a three-judge district court panel heard challenges to New York's election laws brought by two "minority parties." 314 F. Supp. 984, 986–88 (S.D.N.Y. 1970). One law provided that a voter list would "be sent free of charge to those parties which polled more than 50,000 votes in the last gubernatorial election." *Id.* at 987. Political parties that didn't meet this threshold had to pay for the list. *Id.* at 995. This law was unconstitutional, the three-judge panel held, because it "den[ied] independent or minority parties *which have succeeded in gaining a position on the ballot* but which have not polled 50,000 votes for governor in the last preceding gubernatorial election an equal opportunity to win the votes of the electorate." *Id.* (emphasis added). The Supreme Court summarily affirmed. *Socialist Workers Party*, 400 U.S. at 806.

We aren't bound by this summary affirmance. Although the "Supreme Court's summary dispositions are of course entitled to full precedential respect," *Picou v. Gillum*, 874 F.2d 1519, 1521 n.3 (11th Cir. 1989), the "Court has cautioned that we must not overread its summary affirmances," *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1267 (11th Cir. 2020). "[T]he precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions. A summary

disposition affirms only the judgment of the court below, and no more may be read into [the Supreme Court's] action than was essential to sustain that judgment." *Id.* (quoting *Anderson*, 460 U.S. at 784–85 n.5).

The precise issue in *Socialist Workers Party* that the Supreme Court summarily affirmed is different than the issue here. The voter list law in that case was unconstitutional because it denied minor political parties free access to the voter list even if they had "succeeded in gaining a position on the ballot." 314 F. Supp. at 995. But here, "each" political party in Alabama with ballot access gets a copy of the voter list for free. Ala. Code. § 17-4-33(a)(10). Thus, the New York law imposed burdens on political parties beyond simply obtaining ballot access. The Alabama law does not impose this burden; rather, it gives "each" political party with ballot access—major and minor alike—a free copy of the voter list. *Id.*

In other words, Alabama's voter list law gives minor parties "the same benefit granted to major political parties." *Socialist Workers Party*, 314 F. Supp. at 996. Because *Socialist Workers Party* does not involve the "precise issues presented" here, it doesn't control this case. *See Jacobson*, 974 F.3d at 1267. We decline to read more into *Socialist Workers Party* than what "was essential to sustain that judgment." *Anderson*, 460 U.S. at 784 n.5.

## CONCLUSION

The district court did not err in its application of the *Anderson-Burdick* test to the Libertarian Party's challenge to Alabama's

voter list law.  The voter list law did not discriminate against the Party or severely burden its constitutional rights.  It rationally served two categories of important state interests—Alabama's interest in supporting political parties with a modicum of popular support and its administrative interests.  And the non-severe burdens on the Party's rights did not outweigh the state's regulatory interests.  The district court's summary judgment for the secretary is therefore **AFFIRMED.**